# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

_____

THE MORTGAGE MARKET                    :
GUIDE, LLC,                            :
                                       :
        Plaintiff,                     :        Civil Action No. 06-cv-140-FLW
                                       :
                                       :
        v.                             :
                                       :
FREEDMAN REPORT, LLC et al.,           :
                                       :        **OPINION**
        Defendants.                    :
                                       :
_____       :

APPEARANCES:

Michael M. Rosenbaum, Esq.
Budd Larner, PC
150 John F. Kennedy Parkway
CN 1000
Short Hills, New Jersey 07078-0999

_Attorneys for Plaintiff, The Mortgage Market Guide, LLC_

John G. Gilfillan, III, Esq.
Kenneth L. Winters, Esq.
Carella, Byrne, Bain, Gilfillan,
Cecchi, Stewart & Olstein, PC
5 Becker Farm Road
Roseland, New Jersey 07068

_Attorneys for Defendants, The Freedman Report, LLC, Aaron Freedman,  David Mozes, and Donald Greitzer_

**WOLFSON, United States District Judge**

This matter comes before the Court upon an Amended Complaint brought by Mortgage Market Guide, LLC ("MMG") against Defendants The Freedman Report, LLC ("Freedman Report"), Aaron Freedman ("Freedman"),  David Mozes ("Mozes"), and Donald Greitzer ("Greitzer") (collectively, "Defendants").  This action arises from Plaintiff MMG's claim that Defendants reproduced a particular page of the MMG Website, its bond page which provides mortgage based security information to its subscribers, on the Freedman Report's website.[1]  After a fifteen day bench trial, the only counts remaining against Defendants are copyright infringement and breach of contract.  Defendants primary defense against the claim of copyright infringement is that Plaintiff does not have a valid copyright registration.  Defendants assail Plaintiff's copyright registration by pointing out a series of errors made by Plaintiff and its counsel during the registration process.  Additionally, Defendants attack Plaintiff's breach of contract claim by asserting that it is preempted by the Copyright Act.

The Court finds that:  (1) despite a variety of defects and numerous errors made during the course of Plaintiff's copyright registration of the MMG Website, nonetheless its copyright is still valid; and (2) Plaintiff's breach of contract claim is preempted by the Copyright Act because Plaintiff's breach of contract claim asserts the same rights protected by copyright law.  As to liability, the Court finds that the Freedman Report, Freedman, and Mozes are liable for copyright infringement: the Freedman Report reproduced MMG's bond page and is therefore liable for

---

[1] Plaintiff originally asserted a claim for copyright infringement against the Defendants for infringement of the entire MMG Website.  However, during the course of litigation Plaintiff narrowed its copyright infringement claim to only include infringement of its bond page located on the MMG Website.

infringement; Freedman and Mozes are liable due to their financial stake in the infringing company, the Freedman Report, and their supervisory role in directing the infringement. However, the Court finds that none of the Defendants are liable for breach of contract because Plaintiff's breach of contract claim is preempted.

## I.     OVERVIEW

### A.     PARTIES

Plaintiff MMG is a New Jersey limited liability company owned by Barry Habib ("Habib"), a 74% owner, and Curtis Warner ("Warner"), a 26% owner.  (Tr. Vol. 1, Warner, April 9, 2007 at p. 87).  MMG was founded in 2001 and Warner is the Chief Operating Officer. (Id. at 87:4-6).  Defendant Freedman Report, LLC ("Freedman Report") is a California based limited liability company.  (See Compl.).  Defendants Freedman, Mozes, and Greitzer are all employees of Defendant Freedman Report.  Freedman and Mozes each own a 50% stake in the Freedman Report, (Tr. Vol. 2, Freedman, April 10, 2007 at p. 46:11-46:17), and Greitzer is the Freedman Report's Director of Marketing, a job that he held since March 2005. (Greitzer Dep. 5:18-24).  The Freedman Report was conceived in the summer of 2004 by Freedman and Mozes. (Tr. Vol. 2, Freedman, April 10, 2007 at p. 46:7-46:10).

### B.     PROCEDURAL HISTORY

On January 10, 2006, Plaintiff MMG filed a Complaint in the District of New Jersey against Defendant Freedman Report alleging copyright infringement, trade dress infringement, unfair competition, tortious interference with prospective contract relations and unjust enrichment.  (See Compl.).  On July 26, 2006, Plaintiff MMG filed an Amended Complaint adding Defendants Freedman, Mozes, and Greitzer as parties and counts against all Defendants

for conversion, and breach of contract.  (See Amended Compl.).  On November 1, 2006,

Defendants filed a Motion to Dismiss Plaintiff's Complaint for Lack of Subject Matter

Jurisdiction as to the Copyright Claim.  The Court held a conference call with all counsel on

November 21, 2006, wherein the Court notified counsel that it would decide Defendants' Motion

to Dismiss at the time of trial.  A fifteen day trial commenced on April 9, 2007, and after a few

interludes in between, ended on January 9, 2008.  All parties submitted their proposed findings of

fact and conclusions of law to the Court on March 3, 2008.

## II.    FINDINGS OF FACT

### A.    Development of the Mortgage Market Guide Website

Habib, Warner, Paul Harrison ("Harrison"), a web developer, and some others began

development of the Mortgage Market website ("MMG Website") in 2001.  (Tr. Vol. 3, Habib,

April 11, 2007 at p. 99:19-25).  MMG's live bond page as it appeared on July 27, 2005 (except

for the trendline customization option), first appeared on the MMG Website in late 2003.  (Tr.

Vol. 1, Warner, April 9, 2007 at p. 88:4-15; D-7, p 256).  MMG's Website, at least until January

2003, was developed by one or more independent contractors, none of which were employees of

MMG before January 2003. (Tr. Vol. 1, Warner, April 9, 2007 at p. 119:11-120:3; Tr. Vol 7,

Warner, October 11, 2007 at p. 50:11-56:11).  Warner testified that the MMG website had a bond

page with a listing of one or more securities, dynamic pricing, a candlestick chart, and

customization options since before it was redesigned in 2003.  (Tr. Vol 7, Warner, October 11,

2007 at p. 4:14-5:24).  However, Warner also testified that the candlestick chart first appeared on

MMG's website, in the form submitted in MMG's copyright registration, in late 2003, (Tr. Vol.

1, Warner, April 9, 2007 at p. 88:21 - 89:1), the customization chart option first appeared on

MMG's website sometime late 2003, early 2004, (Tr. Vol. 1, Warner, April 9, 2007 at p. 88:21 - 89:1), and Habib testified that the bond page with all of the customization options, including trendlines, was first published on July 27, 2005.  (Tr. Vol. 3, Habib, April 11, 2007 at p. 117:14 - 118:4).  MMG has not produced any written agreement whereby it acquired the copyrights from any of these third party contractors with respect to the aspects of MMG's bond page that existed before the 2003 redesign, however the record demonstrates that at least some of the third party contractors involved in web development became employees of the company in early 2003.  (Tr. Vol. 1, Warner, April 9, 2007 at p. 119:11-120:3; Tr. Vol 7, Warner, October 11, 2007 at p. 50:11-56:11).

### B.    Selection and Arrangement of the MMG Bond Page

The MMG live bond page permits customization of its candlestick chart.  Since before July 27, 2005, those customization options included stochastics, resistance and support, moving averages, time frame, and security.  (Tr. Vol. 3, Habib, April 11, 2007 at p. 101:15 - 25).  Habib testified that he selected stochastics because of his belief that it is not a typical analytical tool for determining the market direction of mortgage-backed securities and because it tied into his seminar teaching.  (Tr. Vol. 3, Habib, April 11, 2007 at p. 102:3 - 8, 103:20-25).  Habib selected 21 trading days for MMG's stochastic analysis, even though the standard time frame for stochastic analysis is 14 trading days.  (Tr. Vol. 3, Habib, April 11, 2007 at p. 104:17 - 25; Tr. Vol. 4, Gramza, April 12, 2007 at p. 108:1 - 109:9).  Habib also testified that he chose a longer time frame because of his perception that there is less activity in the mortgage market than in other securities.  (Tr. Vol. 3, Habib, April 11, 2007 at p. 105:2 - 12).

MMG chose four mortgage backed securities and the 10 year treasury note from a universe of 1,400 mortgage backed securities.  (Tr. Vol. 3, Warner, April 11, 2007 at p. 35:5-22). With regard to the mortgage backed securities on MMG's bond table, Habib decided to provide not only the price of the securities at the last sale, but also pricing changes from the last sale and changes from 10:00am, 10:30am, 11:00am, and 11:30am.  Given his experience, Habib was aware these were the times mortgage brokers received interest rate quotes from lending institutions.  Thus, the bond table provided dynamic rather than static pricing.  (Tr. Vol. 3, Habib, April 11, 2007 at p. 108:13 - 110:9).  According to Habib, and it stands uncontradicted, none of MMG's competitors provided a live bond table with dynamic pricing until the Freedman Report published its live bond page. (Tr. Vol. 3, Habib, April 11, 2007 at p. 110:10 - 16).  The "last sale" price for the mortgage-backed securities refreshes every two minutes or can be refreshed manually on the MMG bond page.  (Tr. Vol. 3, Habib, April 11, 2007 at p. 111:16-22). Habib chose a two minute refresh rate instead of streaming because of his concern that some of MMG's potential customers' computers may not accept streaming information.  (Tr. Vol. 3, Habib, April 11, 2007 at p. 112:23 - 113:17).  The Freedman Report also uses a two minute refresher for its candlestick chart.  (Tr. Vol. 3, Habib, April 11, 2007 at p. 113:3 - 8).

MMG first utilized trendlines as a customization option in its bond page on July 27, 2005.  (Tr. Vol. 3, Habib, April 11, 2007 at p. 117:14 - 25).  According to Warner's testimony, MMG was the only website company in the mortgage industry that utilized a dynamic bond table to express price changes of various mortgage backed securities several times a day.  (Tr. Vol. 3, Warner, April 11, 2007 at p. 37:5-11; 38:25-39:12; 40:6-23).  Freedman also testified, that to his knowledge, none of the other mortgage related websites, such as Market Alert, MBS Quoteline,

Shirmeyer and MBS Alert have dynamic candlestick charts, dynamic bond tables or display stochastics.  (Tr. Vol. 2, Freedman, April 10, 2007 at p. 70:16-71:1; 72:2-9).

In addition, MMG selected basis points to express bond price changes instead of fractions.  In Habib's opinion, using basis points as opposed to fractions is wrong, reasoning that a mortgage security's smallest increment is 1/30 which is the equivalent of 3.125 basis points. (Tr. Vol. 6, Habib, October 10, 2007 at p. 118:1 - 8).  MMG uses three basis points to reflect a price change, which Habib avers is technically inaccurate.  (Tr. Vol. 6, Habib, October 10, 2007 at p. 118:1 - 20).  Freedman used the same basis point system.  (Tr. Vol. 6, Habib, October 10, 2007 at p. 118:1 - 20).

Testimony from Defendants' expert Daniel Gramza ("Gramza"), indicates that there are over 1,358 mortgage-backed securities from which one can choose.  An analyst must then select the type of chart to display information (i.e. - bar chart, Japanese candlestick, butterfly, etc.).  (Tr. Vol. 4, Gramza, April 12, 2007 at p. 94:4-95:13; 96:14-105:12).  Then there are 40-50 analytical studies from which to choose.  (Tr. Vol. 4, Gramza, April 12, 2007 at p. 123:4-7).  These various factors have all been pre-selected by MMG and are presented in a unique combination to its users.  This conclusion is supported by Gramza's testimony that "it's unique to display a mortgage-backed security in a candle format," and that the Freedman Report and MMG Website were the only ones he was aware of to display mortgage-backed securities in such a way.  (Tr. Vol. 4, Gramza, April 12, 2007 at p. 117:18-20; 119:8-15; 168:5-14).  The Court finds that Gramza's testimony in connection with the uniqueness of displaying securities in the way described to be credible.

### C.    Defendants' Copying of the MMG Bond Page

Freedman testified at his deposition that he first looked at MMG's Website, including its

bond page, in early 2005 with his colleague Michael Glick. (Tr. Vol. 2, Freedman, April 10, 2007

at p. 60:8-62:13).  Freedman also testified that the Freedman Report looked at the websites of

competitors who distributed mortgage related information.  (Tr. Vol. 2, Freedman, April 10,

2007 at p. 55:12-23).  Those websites included Market Alert, MBS Quotelines, Shirmeyer

Report, MBS Alert and Plaintiff MMG's Website.  (Tr. Vol. 2, Freedman, April 10, 2007 at p.

56:3-6).  Freedman testified that at the time, the Freedman Report's other competitors did not use

candlestick charts.  (Tr. Vol. 2, Freedman, April 10, 2007 at p. 62:20-63:10).  Freedman also

testified at his deposition that he became an actual member of the MMG Website in December

2005, surreptitiously using the alias of Milton Fixel.  (Tr. Vol. 2, Freedman, April 10, 2007 at p.

57:1-58:10).  Freedman logged in under this alias almost every day.  (Tr. Vol. 2, Freedman, April

10, 2007 at p. 59:16-25).  Freedman testified that other websites did have bond tables, but none

that looked exactly like MMG's bond table. (Tr. Vol. 2, Freedman, April 10, 2007 at p. 64:3-

65:11).

Mozes first viewed the MMG Website sometime before August 27, 2004.  (Mozes Dep.

49:20-25).  Subsequently, Mozes tracked the development of the MMG website "to see what

elements they had added over time."  (Mozes Dep. 73:12-20).  Through his monitoring, Mozes

was aware that MMG had a newsletter, and in late 2005, he, Freedman, and Greitzer decided that

the Freedman Report would also publish a newsletter.  (See Mozes Dep. 103:13-20; 105:23-25).

Exhibit P-58 is an email dated October 4, 2005 confirming that Freedman got the idea of a

newsletter from MMG and had a copy of MMG's newsletter "to see what it looked like."  (Ex. P-

58, Email, p. 2).

Greitzer is the Freedman Report's Director of Marketing, a job he has held since March 2005. (Greitzer Dep. 5:18-24).  Greitzer interviewed for the marketing director's job in March of 2005.  (Greitzer Dep. 10:4-11).  The night before his interview, Mozes, one of the founders of the Freedman Report, suggested that Greitzer look at MMG's Website to understand what the Freedman Report wanted to do.  (Greitzer Dep. 14:4-18; Mozes Dep. 30:21-31:13).  Mozes did not discuss any other competing websites with Greitzer during his interview.  (Mozes Dep. 31:22-32:1).  When Greitzer was hired, his primary responsibility was to manage setting up the Freedman Report's website.  (Greitzer Dep. p.28:20-29:9).  In the summer of 2005, Greitzer subscribed to MMG using the fictitious name of Daniel Raymond, (Greitzer Dep. 15:7-15), and logged in 26 times between June 28 and July 13, 2005. (Tr. Vol. 7, Warner, October 11, 2007 at p. 65:20-66:5).

As of March 2005, the Freedman Report did not have a functioning website, i.e. - it only had a shell with a functioning homepage - there was no bond page and no other functioning pages at the time.  (Greitzer Dep. 19:10-21; 20:1-7; Byer Dep. 33:22-36:15).  Greitzer was the principal person dealing with Jeff Byer ("Byer") at Dice Media, which was the website development company the Freedman Report hired to design its website.  (Greitzer Dep. 28:20-29:17).  Freedman gave Byer a link to the MMG Website and Byer subscribed to the MMG Website under his own name.  (Byer, 33:22-36:15).  He logged in 13 times between May 25 and June 9, 2005.  (Tr. Vol. 7, Warner, October 11, 2007 at p. 67:25-68:11).

### D.    Nabh Proposals to the Freedman Report for Website Development

The Freedman Report hired Padmanabh Dabke's ("Dabke") company, Nabh Information Systems, Inc. ("Nabh") to provide an application that would allow financial information to be

displayed on the Freedman Report's website.  Dabke is the principal of Nabh.  (Dabke Dep. p.

11).  He became involved with the Freedman project in July 2005 through Byer.  (Dabke Dep.

14:21-25).  Essentially, Byer directed Dabke to replicate portions of the MMG Website for the

Freedman Report, (Dabke Dep. 14:23-15:11), and Dabke referred Wirawan Chokry ("Chokry"),

an employee at Nabh since April 2003, to the MMG public bond page, (Dabke Dep. p. 26).  At

the time, the MMG Website contained a bond table, a candlestick chart, and option panel to

configure the chart.  (Dabke Dep. 16:1-5).

Dabke's contract was with Freedman, although Byer put Dabke in touch with Freedman.

(Byer Dep. 66:25-67:9).  As demonstrated by Exhibit P-32, in a July 14, 2005 email, Dabke

stated that he looked at the MMG website to see what was involved in the project.  (See P-32).

Byer's testimony indicates that Freedman's bond page was derived from MMG's bond page.  He

testified that Freedman presented the candlestick information to Dabke, (Byer Dep. 78:4-79:12),

and that the customization options appeared to have been taken from the MMG Website, (Byer

Dep. 83:18-21).  Similarly, he testified that the stochastic option also appeared to be taken from

the MMG Website,  (Byer Dep. 83:22-84:11), and that the resistance and support options were

also derived from the MMG Website, (Byer Dep. 86:17-87:11).  In fact, consistent with Byer's

testimony, the Court finds that the information located in Dabke's initial statement of work came

directly from MMG's Website.  (Byer Dep. 86:5-88:20).  Accordingly, the Court finds that

Byer's testimony in connection with the copying of MMG's bond page features to be highly

credible because of his position as an employee of the Freedman Report.

Chokry worked on the Freedman Report website as an employee of Nabh.  (Chokry Dep.

p. 7, 13).  Chokry was instructed to build a website using the MMG Website as an example to

"implement" the chart application.  (Chokry Dep. p. 14-17).  He testified that he viewed the

MMG Website's public page and replicated the information on the chart displayed there.

(Chokry Dep. p. 14-17).  Additionally, Dabke instructed Chokry to build a website including an

editor to set user preferences regarding alerts – this was also a feature employed by the MMG

Website.  (Chokry Dep. p. 23).  Chokry's testimony indicates that the MMG bond page was the

only website that he was directed to duplicate.  (Chokry Dep. p. 81-82).

 Freedman asked Byer of Dice Media to design his website in August 2004, however this

proposal, Exhibit P-81,  which is Dice Media's August 27, 2004 proposal, had no reference to a

bond page. Also, P-83, which is Dice's April 7, 2005 proposal likewise contained no reference to

a bond table or a candlestick chart.  (Tr. Vol. 12, Freedman, November 5, 2007 at p. 47:2-49:13).

The first time that Dice was asked to supervise the creation of a bond table for Freedman is in

paragraph 6 of its July 19, 2005 proposal (P-84).  This was after Greitzer and Byer had looked at

MMG's bond page multiple times through their subscriptions.  In the July 19, 2005 proposal,

Exhibit P-84, for the first time, Dice agreed to manage "the 3rd party vendor in development of

the program to display the Telerate API content."  Byer contracted the design of the Freedman

Report's bond page to Nabh.  (Tr. Vol. 2, Freedman, April 10, 2007 at p. 83:18-84:2).

Freedman told Byer and Nabh about the features he wanted in the customization box.  He told

them he wanted moving averages, the ability to draw in support and resistance levels and

trendlines and stochastics.  (Tr. Vol. 2, Freedman, April 10, 2007 at p. 84:7-25).  MMG has the

identical features in its customization box.  (Tr. Vol. 2, Freedman, April 10, 2007 at p. 84:7-25).

 Significantly, in Exhibit P-33, under the heading "Updating the Bond Rate Table," Nabh

confirmed that the Freedman bond table he was working on "will display a table similar to the

one shown in the figure above," which was MMG's actual bond table.  (Tr. Vol. 2, Freedman,

April 10, 2007 at p. 87:1-90:1).  Nabh's July 14, 2005 work quote (P-33) also includes a

candlestick chart similar to MMG's.  (Tr. Vol. 2, Freedman, April 10, 2007 at p. 87:1-90:1).

Freedman's bond table and candlestick chart were also to be dynamic just that like that of MMG.

Page 1 of P-33 indicates that Freedman's bond table will update every 30 minutes, making it

dynamic, just as MMG's bond table.  Moreover, page 1 of P-33 states: "The customer will be

alerted if the price change falls outside the limits specified by the customer."  That is a service

Freedman wanted to offer and MMG also offered that service.  (Tr. Vol. 2, Freedman, April 10,

2007 at p. 93:14-94:7).  The second page of P-33 titled "2.  Alerts Editor" states "[t]he

application will provide a simple forms editor to set user preferences corresponding to positive

and negative price deltas and the time at which the alerts are sent."  Freedman's testimony

indicates that his understanding is that the subscriber will choose certain thresholds, and if the

chosen threshold is reached, the subscriber gets a text alert on the telephone.  Freedman's

testimony also indicates that he understood that MMG provided the identical service.  (Tr. Vol.

2, Freedman, April 10, 2007 at p 91:1-19).

　　Greitzer looked at MMG's website 26 times between June 23, 2005 and July 13, 2005.

(Tr. Vol. 7, Warner, October 11, 2007 at 65:20-66:5).  Byer looked at MMG's website 13 times

between May 25, 2005 and June 9, 2005. (Tr. Vol. 7, Warner, October 11, 2007 at 67:25-68:11).

To do so, both Greitzer and Byer became trial MMG members and thus agreed not to:

> 4.　　upload, post, publish, transmit, reproduce, distribute or in any way exploit
> any information, software or other material obtained through the Service for
> commercial purposes (other than as expressly permitted by the provider of such
> information, software or other material).

(P-120, p. 3).  Exhibit P-120 is MMG's "Subscriber Terms and Conditions of Use."  (Tr. Vol. 5, Habib, October 9, 2007 at 103:8-11).  In order to access MMG's site either as a paid subscriber or for a trial subscription, the user would have to hit "accept" the Subscriber Terms and Conditions of Use.   (Tr. Vol. 5, Habib, October 9, 2007 at 103:12-20).  "Step 6" on D-7, p. 277 involves a subscriber's agreement to the MMG Terms and Conditions.  A subscriber must first "click here to view the terms and conditions agreement."  (Tr. Vol. 3, Habib, April 11, 2007 at 118:5-119:3).  When they signed up for their subscriptions, Greitzer and Byer were subject to the same sign up process.

       At the time of their subscriptions, Byer and Greitzer were working with Nabh to develop the Freedman Report's website.  P-32 is Dabke's email to Byer, dated July 14, 2005, regarding Dabke's preparation of Nabh's Initial Statement of Work.  In P-32, Dabke states that he looked at MMG's site to "see what is involved in this project."  Dabke's questions in P-32 reference the MMG elements, as does P-33.  P-34 references Byer's response to P-32 (Dabke's July 14, 2005 email to Byer).  Thus, it is clear that by July 15, 2005, Byer is responding to questions asked of him by Dabke after he accessed MMG's website, including its bond page.  P-35 is a July 18, 2005 email from Byer to Dabke and Chokry (of Nabh) asking for another Nabh work proposal.  Again, this shows Byer's involvement with Nabh after he logged onto MMG's website.  P-36 is a July 18, 2005 email from Dabke to Byer attaching another Nabh work quote, which is P-37.  That work quote is substantially the same as the earlier work quote, including reference to MMG's bond table and candlestick chart.  Again at page 1 of P-37, Nabh indicates it will create a bond table "similar to the one shown above," which was MMG's bond table.  P-38 is a July 22, 2005 email from Greitzer to Freedman and Mozes showing his involvement in the development of

-13-

Freedman's bond page.  In P-38, Greitzer acknowledges that he reviewed the Nabh proposal and

had questions concerning it.  P-39 is an August 8, 2005 email from Dabke to Byer and Greitzer

dealing with the development of the Freedman bond page.  That email asks the Freedman Report

to summarize changes discussed earlier.  P-39 also includes an August 26, 2005 email from

Dabke to Greitzer and Freedman which enclosed the August 26, 2005 Bond Quote Application

(P-49).

Exhibit P-42 is the August 23, 2005 "Bond Quotes Application: Project Quote" from

Nabh.  The table in Section 1.1, "Bond Rate Table," reflects what the Freedman Report wanted.

(Tr. Vol. 2, Freedman, April 10, 2007 at 115:25-116:3).  Section 1.3 of Exhibit P-42 shows the

proposed candlestick chart for the Freedman Report which Nabh designed.  (Tr. Vol. 2,

Freedman, April 10, 2007 at 116:4-14).  Like MMG, the chart is dynamic and gives the user the

ability to select resistance and support levels, moving averages and stochastics.  According to

Freedman's testimony, at the time, only the Freedman Report and MMG had such a dynamic

chart with those customization options coupled with a dynamic bond table.  (Tr. Vol. 2,

Freedman, April 10, 2007 at 116:20-118:18).  P-49 is the executed Nabh Project Quote.  It

contains the same features as P-33, including a dynamic bond table which is substantially similar

to that of MMG.  It also contains a dynamic candlestick chart with customization options, all of

which are similar to, if not the same as, MMG's.  Therefore, Nabh fulfilled its undertaking to

provide a bond table and candlestick chart with customization options, which it previously stated

would be similar to that of MMG.

On August 30, 2005, Greitzer wrote to Dabke of Nabh, Inc. asking if he could include a

trendline on the Freedman Report's candlestick chart.  This was Freedman's first request to add a

-14-

trendline.  (Tr. Vol. 2, Freedman, April 10, 2007 at 129:9-131:1).  MMG added a trendline to its

chart for the first time on July 27, 2005.  (Tr. Vol. 3, Habib, April 11, 2007 at 117:14-25).  Thus,

Freedman requested the addition of a trendline to the Freedman Report's chart 33 days after

MMG initiated its initial use of trendlines.  By the time Freedman asked Dabke to include

trendlines on the Freedman Report's candlestick chart, he had already seen MMG's trendlines on

its candlestick chart.  (Tr. Vol. 2, Freedman, April 10, 2007 at 131:8-11).  P-10 is the August 30,

2005 email from Freedman asking Dabke to include trendlines on the candlestick chart.

    Exhibit P-26 is the November 8, 2005 Freedman bond page, and P-27 is the November 8,

2005 MMG live bond page.  They are substantially similar if not identical.  Freedman's bond

pricing table contains three Fannie Mae and one Ginnie Mae mortgage-backed security and the

10 year Treasury.  So does P-27, MMG's bond table.  The only difference is that the Freedman

Report uses two 30 year 6% bonds, while the MMG table does not have a 6% bond.  Both tables

show the "current price" (P-26) and "last sale" (P-27).  Both have a day change vertical column

and a change since 9:00 a.m. and 10:00 a.m.  In addition, MMG has a 10:30 a.m. and 11:00 a.m.

change.  Thus they both include a dynamic bond table coupled with a dynamic candlestick chart

with customization options.

    Both P-26 and P-27 show dynamic Japanese candlestick charts immediately below the

bond table.  Both show trendlines.  Indeed, the Freedman Report added trendlines shortly after

MMG incorporated trendlines on its candlestick chart.  Both candlestick charts show 10, 25, 50,

100 and 200 day moving averages.  On both exhibits, a stochastics analysis is in the box

immediately below the candlestick chart and both exhibits use a 21 trading day stochastic.  Both

exhibits show a customization box below the stochastics giving the user the option of time frame,

moving averages and security.  Both exhibits permit the user to choose resistance and support levels, trendlines, and stochastics.  The Freedman Report permits the user to "create graph," while MMG permits the user to "draw chart." At the bottom of the live bond page each exhibit gives the user "chart printing options."  In P-26, the Freedman Report permits a printable candlestick chart and a printable candlestick and stochastic chart.  MMG gives the option of a printable candlestick chart, a printable stochastic chart, and a combination printable candlestick and stochastic chart.  At the very bottom, both exhibits say that "the candlestick chart automatically refreshes every two minutes."

Exhibit D-73 is a purported copy of the MMG Website as it existed on May 20, 2004.  P-33 is the Nabh Initial Project Quote dated July 14, 2005.  In the Nabh Initial Project Quote there is a reference to the MMG Website - paragraph 1 is titled "Updating the Bond Rate Table."  The table columns are labeled as Security, Last Sale, Day Change, 10a.m., 10:30a.m. - these and the other time price changes are exactly the same as in D-73.  (Tr. Vol. 13, Freedman, November 7, 2007 at p. 94:2-20).  The May 2004 MMG Website bond page is substantially the same as the November 2005 MMG Website bond page except for the addition of trendlines and some minor differences.  (Tr. Vol. 13, Freedman, November 7, 2007 at p. 114:12-116:3).

In the present case, the differences between the competing bond pages are negligible.  Out of all the defining features and customization options found on the MMG bond page, the only significant differences between it and the Freedman Report's bond page are that the Freedman Report uses different Fannie and Ginnie Mae securities in its bond table, includes a 40-day moving average and offers the ability to chart the 10 year Treasury.  (Tr. Vol 11, Freedman, October 25, 2007 at p. 33:7-33:19).  However, some other differences do exist, including:  a

different number of columns on the bond table, different benchmark times, different triggers for the appearance of a red or green background on the bond table, different choices for the time frames for the chart, different choices for moving averages, different printing options, different colored candlestick wicks, no gap between candlestick wicks and bodies, and different options for stochastics. (Tr. Vol 13, Freedman, November 7, 2007 at p.124:12-128:17).

In addition, the Freedman Report's pop-up box on the candle is a feature that provides different information than is contained in MMG's pop-up. (Tr. Vol. 2, Freedman, April 10, 2007 at 119:5-120:23; P-43, P-44). The Freedman Report's coloration of the bond table also works differently than MMG's. The background on the Freedman Report's bond table is red or green, depending on the day change. MMG's background only takes on a color if the user's threshold has been met. (Tr. Vol. 3, Warner, April 11, 2007 at 54:15-56:6; Tr. Vol. 5, Habib, October 9, 2007 at 55:3-59:12; see also Tr. Vol 11, Freedman, October 25, 2007 at 13:8-14:19). The Freedman Report's stochastics chart shows 75 and 25 as the overbought and oversold levels, while MMG's stochastics chart shows 80 and 20 as those levels. Id. The Freedman Report's bond page does not provide a pop-up web alert window when a user's price threshold has been exceeded or when there is a price change alert, (Tr. Vol 11, Freedman, October 25, 2007 at 60:21-61:11; Tr. Vol 10, Freedman, October 24, 2007 at 60:23-61:2), while MMG's bond page does. Also, the Freedman Report's intraday price change alert appears on the daily report page, not as a pop-up on the bond page. (Tr. Vol 9, Freedman, October 23, 2007 at 69:5-71:8). There is also a difference between MMG and the Freedman Report's alert interface because the Freedman Report's mechanism to set the threshold for an alert is different than MMG's interface for setting alerts. (P-64, P-65).

-17-

Nonetheless, a close comparison of the two websites demonstrates that both the MMG Website and the Freedman Report have a dynamic bond table, a candlestick chart, and customization options. The customization options are similar and both contain stochastics, trendlines, moving options, customization options, as well as resistance and support. Similarly, both websites give the user the ability to view dynamic candlestick charts only. (Tr. Vol. 13, Freedman, November 7, 2007 at p. 114:12-116:3). This evidence, despite other small differences, demonstrates that the MMG Website bond page was copied by the Freedman Report.

### E.    THE FREEDMAN REPORT MAKES CHANGES TO ITS WEBSITE

The Freedman Report revised its bond page in or about January 2006. Exhibit P-60 is a February 7, 2006 proposal by Nabh Information Systems, Inc. titled "Chart Editing Panel Modifications Quote." This resulted from Freedman's request to Nabh to modify the Freedman Report website. (Tr. Vol. 2, Freedman, April 10, 2007 at p.148:10-25). Exhibit P-26 is the Freedman Report's bond page as it existed prior to February 2006. (Tr. Vol. 2, Freedman, April 10, 2007 at p.151:12-15). This request followed the filing of the Complaint in this case by a month. The elements that were changed are described in a Statement of Work, which is entered into evidence as P-60:

> 3.    An image will be added at the bottom of the [candlestick] chart. Clicking on this image will bring up the chart control panel [the customization options]. The contents of this panel will be exactly the same as the current editor pane. Clicking on the "Draw Chart" button at the bottom of this panel will close the pop-up and redraw the chart based on the new parameters.

(Ex. P-60). The customization options on P-26 are identical to those in the "current [Freedman] editor pane" and were simply transferred to a pop-up window activated by clicking a button as shown on P-61. (Tr. Vol. 2, Freedman, April 10, 2007 at p.152:3-13, 156:19-157:15). The two

-18-

chart-printing links on the bottom of P-26 were removed.  (Tr. Vol. 2, Freedman, April 10, 2007 at p. 153:17-154:10).  Chart customization options were displayed horizontally after February 2006, instead of vertically, as in P-26.  (Tr. Vol. 2, Freedman, April 10, 2007 at p. 158:4-159:8). But they are the same customization options.  (Tr. Vol. 2, Freedman, April 10, 2007 at p. 158:4-159:8).  The "set alert" on P-26 was changed to an upward pointing arrow, but the arrow on P-61 gives the same "set alert" options as P-26.  (Tr. Vol. 2, Freedman, April 10, 2007 at p. 159:9-160:11).

In P-61, a copy of the Freedman Report Website dated May 19, 2006, there is a downward arrow labeled "Click here to customize graph."  Freedman conceded that when you click on that, the customization panel at the bottom of the Freedman Report's previous live bond page (P-26) will pop up.  (Tr. Vol. 13, Freedman, November 7, 2007 at p. 70:7-71:16).  The customization options in P-61 are identical to the previous format.  (Tr. Vol. 13, Freedman, November 7, 2007 at p. 71:9-16; see also Ex. D-11).  The pop-up that is displayed when the cursor is held over a candle is the same as it was on the prior Freedman Report bond page.  (Tr. Vol. 13, Freedman, November 7, 2007 at p. 72:4-20).  Also, the arrow link stating "Click here to set text alerts" shows the same text alert editor as shown on the previous Freedman Report bond page.  (Tr. Vol. 13, Freedman, November 7, 2007 at p. 73:10-24).  The Freedman Report's bond page was revised again later so that (i) only four securities appear for the current bond pricing, and (ii) each securities' pricing is displayed in a separate table.  (Tr. Vol. 6, Habib, October 10, 2007 at p. 72:24-73:20; Ex. D-12).  However, the Court finds that the 2006 changes were

-19-

cosmetic, as demonstrated in Freedman's testimony and by reference to Exhibits P-26 and P-27, D-11, D-12 and P-60 through P-64.[2]

### F.    MMG WEBSITE'S TERMS AND CONDITIONS

The MMG website contained a copyright notice indicating "© COPYRIGHT 2005 MORTGAGE MARKET GUIDE, LLC."  In P-120, the Subscriber's Terms and Conditions of Use, the paragraphs listing what a subscriber may not do informs the subscriber that MMG is protected under U.S. copyright laws.  (See P-120, ¶¶ 1-2).  Exhibit P-120 is MMG's "Subscriber Terms and Conditions of Use" (subscriber agreement).    (Tr. Vol. 5, Habib, October 9, 2007 at 103:8-11).  In order to access MMG's site either as a paid subscriber or for a trial subscription, the user would have to "accept" the Subscriber Terms and Conditions of Use.  (Tr. Vol. 5, Habib, October 9, 2007 at 103:12-20).  "Step 6" on D-7, p. 277 involves a subscriber's agreement to the MMG Terms and Conditions.  A subscriber must first "click here to view the terms and conditions agreement."  (Tr. Vol. 3, Habib, April 11, 2007 at  118:5 - 119:3).  Habib testified that subscribers such as Freedman, Greitzer and Byer would have been denied access to MMG's site unless they had agreed to the terms and conditions of use.  (Tr. Vol. 5, Habib, October 9, 2007 at 103:12-20).  Since a paying or trial subscriber must click "accept" after viewing the MMG Website's Terms and Conditions of Use, the Court concludes that Byer, Freedman and Greitzer had notice of the Terms and Conditions of Use and accepted them as a condition of site access.

### G.    COPYRIGHT REGISTRATION

---

[2]P-26 and P-27 are November 8, 2005 exemplars of the Freedman Report and MMG bond pages.  P-60 is Nabh's Statement of Work to make cosmetic changes to the Freedman Report. And P-61, P-62, P-63 and P-64 help demonstrate that the substantive elements the Freedman Report copied from MMG continue to be utilized by the Freedman Report.

Plaintiff first filed an initial copyright registration in December 2005 for the MMG Website.  Numerous errors were present in this first application for copyright registration, including: an incorrect designation of the author; an ambiguous designation as to whether the subject of copyright was a compilation or derivative work; and an incorrect designation of the date of first publication.  To follow, there were numerous attempts by counsel to correct these erroneous submissions through supplemental registrations.  As discussed _infra_, the Court finds that these submissions were not an effort to mislead the Copyright Office, but were merely the result of Plaintiff's and counsels' carelessness and/or lack of knowledge of the intricacies of copyright filing requirements.

Exhibit P-1 is Plaintiff's initial copyright registration application prepared and filed by Jacquelyn Inserra, Esq. ("Inserra") in December 2005.  (Tr. Vol. 1, Inserra, April 9, 2007 at 54:6-13).  Inserra used March 1, 2001 as first publication date in the initial application because Curtis Warner of MMG told her that it was the first date of publication for the MMG Website.  (Tr. Vol. 1, Inserra, April 9, 2007 56:2-7).  In paragraph 6a of P-1, "Derivative Work or Compilation," Inserra added that it contained "securities pricing quotes (including stock and bond quotes) and U.S. Treasury taxation rates."  (Tr. Vol. 1, Inserra, April 9, 2007, at 56:19-57:3).  Inserra testified that she intended to register the work as a compilation, (Tr. Vol. 1, Inserra, April 9, 2007, at 57:2-3), and added the word "text" to paragraph 6b based on her conversations with the Copyright Office, (Tr. Vol. 1, Inserra, April 9, 2007, at 58:12-59:2).

### 1.   THE FIRST AMENDMENT TO THE COPYRIGHT REGISTRATION

After filing the application, Inserra received a call from Jesse Golphin of the Copyright Office.  (Tr. Vol. 1, Inserra, April 9, 2007, at 60:16-23).  As a result of that conversation, Inserra filed P-2, an amendment to the application.  (Tr. Vol. 1, Inserra, April 9, 2007, at 62:4-19).  She changed the name of the author from Habib to MMG.  (Tr. Vol. 1, Inserra, April 9, 2007, at 62:20-63:2).  Inserra testified that pursuant to her conversation with the Copyright Office, the December 4, 2005 signature date should remain the same, (Tr. Vol. 1, Inserra, April 9, 2007, at 63:14-22), and that in preparing P-2, she "did exactly what [Golphin] told [her] to do."  (Tr. Vol. 1, Inserra, April 9, 2007, at 64:1-6).

Exhibit P-3 is the Certificate of Registration, TX-6-274-129, issued by the Copyright Office effective December 7, 2005.  (Tr. Vol. 1, Inserra, April 9, 2007, at 64:16-24).  Exhibit D-7 is the deposit copy.  The first page bears the Library of Congress stamp and the TX-6-274-129 identifies the Certificate of Registration.  Inserra received the deposit copy (D-7) from Warner. (Tr. Vol. 1, Inserra, April 9, 2007, at 66:16-68:9).  Inserra understood that D-7 represented the website as it looked on March 1, 2001, because Mr. Warner told her that March 1, 2001 was the first date of publication.  (Tr. Vol. 1, Inserra, April 9, 2007, at 66:16-68:9).  Inserra testified that Plaintiff intended to copyright the selection and arrangement of the data as a compilation and not the data itself.  (Tr. Vol. 1, Inserra, April 9, 2007, at 69:16-24).  Similarly, Inserra testified that she intended to copyright mainly the selection and arrangement of the data on the bond page, including the Japanese candlestick chart and its customization.  (Tr. Vol. 1, Inserra, April 9, 2007, at 70:4-11).

Inserra left Budd Larner, PC ("Budd Larner") in March 2006, and did no further work regarding the MMG Website's registration after she filed P-2. (Tr. Vol. 1, Inserra, April 9, 2007,

at 70:25-71:4).  Inserra testified that Exhibit P-2 was not a second application, but that it was an

amendment to P-1 and, therefore, repeating information contained in P-1 was not necessary.  (Tr.

Vol. 1, Inserra, April 9, 2007, at 77:17-78:6).  Exhibit D-7A is certified by the copyright office as

a copy of the registration issued by the copyright office.  (Tr. Vol. 1, Inserra, April 9, 2007, at

80:23-81:21).  Warner testified that page 256 of D-7 is a page from MMG's Website containing

an image of the sample bond quote page as it appeared on July 27, 2005.  (Tr. Vol.1, Warner,

April 9, 2007, at 88:1-9).  His testimony also reflects that page 256 also contains a bond quote

table and a candlestick chart, both of which first appeared in the website in late 2003.  (Tr. Vol.

1, Warner, April 9, 2007, at 88:10-20).  Page 257 of Exhibit D-7 contains customization options

which, except for trendlines, first appeared in the website in late 2003 or early 2004.  (Tr. Vol. 1,

Warner, April 9, 2007, at 88:21-89:1).

MMG added trendlines as a customization option on July 27, 2005.  (Tr. Vol. 1, Warner,

April 9, 2007, at 91:11-92:14).  Exhibit P-9 is an archive of MMG's daily market update from

Wednesday, July 27, 2005, and it states: "We have added a new feature to the bond page which

illustrates the trend."  (Tr. Vol. 1, Warner, April 9, 2007, at 93:9-94:15).  D-7 was printed on

November 29, 2005, and Warner testified that as a consequence, it shows certain financial data

from that date.  (Tr. Vol. 1, Warner, April 9, 2007, at 95:4-16).  Warner also testified that other

than for date-sensitive data, there is no difference between the sample bond page in D-7 and the

sample bond page as it existed on July 27, 2005.  (Tr. Vol. 1, Warner, April 9, 2007, at

95:25-96:16).  In addition, Warner testified that on July 27, 2005, he used a program called

"Snaggit" to copy the bond page as it appeared on that date.  (Tr. Vol. 1, Warner, April 9, 2007,

at 122:13-24).  D-7 is an exact snapshot of the bond page on July 27, 2005 at 1:14 Eastern Time.  (Tr. Vol. 1, Warner, April 9, 2007, at 124:6-9).

Defendants aver that Warner's testimony is not credible, alleging that the deposit copy's sample bond table, in D-73, is actually taken from May 24, 2004 and not July 27, 2005.  (Tr. Vol. 7, Freedman, October 25, 2007, at 135:2-140:7).  Thus, making the first publication date much earlier than what was represented in the copyright registration.  Defendants support their assertion by utilizing a third party website called web-archive to produce an after the fact snapshot of the MMG bond page on May 20, 2004, which contains identical financial information as the July 27, 2005 MMG sample bond page submitted to the Copyright Office.[3]  (Tr. Vol. 7, Freedman, October 25, 2007, at 135:2-140:7).  Freedman contends that this shows a discrepancy in Warner's testimony and a misrepresentation to the Copyright Office.[4]  However,

---

[3]The Court notes that other federal courts typically reject documents obtained from web archive services, unless they are accompanied by a "statement or affidavit from [a representative] with personal knowledge of the contents of the [archive] website."  St. Luke's Cataract and Laser Inst. v. Sanderson, 2006 U.S. Dist. LEXIS 28873, *5-*6 (M.D. Fla. May 12, 2006); see also, Novak v. Tuscows, Inc., 2007 WL 922306, *5 (E.D.N.Y. Mar., 26, 2007) (contested web pages from Internet Archive not authenticated under Rules of Evidence because neither testimony nor sworn affidavits were proffered); Telewizja Polska USA v. Echostar Satellite Corp., 2004 WL 2367740 *6 (N.D. Ill. Oct. 15, 2004) (the court allowed entry of data from Internet Archive service, however it was accompanied by an affidavit of a representative of Internet Archive attesting to its authenticity).

In this case, Defendants rely on a web archive service to demonstrate that the MMG sample bond page contains financial information from May 20, 2004, but they have not provided an affidavit attesting to the authenticity of the archived webpage from the archive company.  Courts are usually hesitant to allow such evidence without an accompanying affidavit nonetheless this issue is not controlling in this case because the Court finds Freedman and Warner's testimony regarding the sample bond page consonant and that a credibility determination between the two witnesses is unnecessary.

[4]The Court notes that Warner's testimony regarding his use of the "Snaggit" program is distinguishable from and more reliable than Freedman's testimony which relies on the

this only indicates to the Court that the financial data in the bond page submitted in the deposit copy was from May 24, 2004 and not July 27, 2005.  The deposit copy containing the MMG bond page in question is labeled as a sample bond page and indicates that it is not populated with live bond information, therefore, it is not contradictory that it contains financial data from a previous date.  Thus, it has no implication to the copyright registration's validity and the Court finds that both Warner and Freedman's underlying testimony regarding this issue, along with a comparison of D-7 and D-73, is consistent with Warner's representations made to the Court and the Copyright Office.

### 2.     THE SECOND AND THIRD AMENDMENTS TO THE COPYRIGHT REGISTRATION

In July 2006, Michael Rosenbaum, Esq. prepared Exhibit P-4 to amend the existing registration primarily to change the date of first publication from 2001 to 2003.  (Tr. Vol. 1, Rosenbaum, April 9, 2007, at 129:12-130:6).  P-4 is on a form promulgated by the copyright office as "Form CA for Supplementary Registration."  (P-4 (upper right corner)).  P-4 also contained other changes such as the address of MMG, the name of the contact person from Inserra to Rosenbaum and, on line 6b, "text" was expanded to read "Compilation and new material including text, graphs, charts, tables and artwork relating to the mortgage market."  Line 2A was supplemented to state that it was "Online work consisting of analysis of the mortgage market, including charts, table, graphs and commentary."  (Tr. Vol.1, Rosenbaum, April 9, 2007, at 130:20-132:3; Ex. P-4).  Exhibit P-6 is the copyright registration issued as a consequence of P-4.  It bears the registration number TX-6-274-129 which is the registration number originally

---

webarchive service because it is based on Warner's personal knowledge through his use of a program to take a snapshot rather than using a third party company's archive of old web pages.

issued by the Copyright Office.  P-6 states that the registration's effective date is December 7, 2005.  (Tr. Vol.1, Rosenbaum, April 9, 2007, at 135:1-21; Ex. P-4).  Exhibit P-6 contains a date of first publication of November 29, 2005.  The 2005 publication date was a change effected by the Copyright Office because the deposit copy showed a November 29, 2005 date.  (Tr. Vol.1, Rosenbaum, April 9, 2007, at 133:22-135:5; Ex. P-6).  Mr. Rosenbaum thereafter conversed with the Copyright Office and explained that D-7 was first published on July 27, 2005, and that November 29, 2005 was the date it was printed.  The Copyright Office advised him to file an amended application.  (Tr. Vol.1, Rosenbaum, April 9, 2007, at 136:14-137:12; Ex. P-6). Exhibit P-102 is the amended application on form "CA for Supplementary Registration."  (Tr. Vol.1, Rosenbaum, April 9, 2007, at 136:11-22; Ex. P-102).  As reflected in P-102, the registered copyright was amended by the Copyright Office on January 18, 2007, to reflect July 27, 2005 as the date of first publication.  The Court finds that July 27, 2005 is the proper date of first publication for the MMG bond page, with its addition of trendlines.

### H.   MMG'S LIVE BOND PAGE CAN BE ACCESSED INDEPENDENTLY OF ACCESSING THE ENTIRE WEBSITE AND IS THUS SELF-CONTAINED

During the course of this case, Plaintiff's claim of copyright infringement against the Defendants has been limited from infringement of the entire MMG Website to infringement of its bond page, a singular web page in the MMG Website.  Therefore, the Court need only look at MMG's bond page at pages 256 and 257 of D-7.  The live bond page is found on MMG's Website, and it is completely self-contained.  (Tr. Vol. 3, Habib, April 11, 2007, at 115:13-18; Warner, 22:20-23; Ex. P-13).  A client can access the MMG live bond page without accessing the entire website.  (Tr. Vol. 3, Habib, April 11, 2007, at 115:13-18; Warner, 23:1-4).  This is

accomplished through an email from MMG which contains an embedded link that connects the subscriber directly to the live bond page.  The live bond page is independent of the rest of the site.  (Tr. Vol. 3, Warner, April 11, 2007, at 23:1-17).  The live bond page operates independently because it is dynamic and changes with changes in market pricing, refreshing every two minutes.  (Tr. Vol. 3, Warner, April 11, 2007, at 25:5-8).  The live bond page can also be accessed from the link at the top of the navigation bar in the MMG Website.  (Tr. Vol. 3, Warner, April 11, 2007, at 25:16-21).  A subscriber also could save the live bond page on his or her browser and go directly to the live bond page.  (Tr. Vol. 3, Habib, April 11, 2007, at 115:22-116:18; Warner, 23:5-26:5).  Accordingly, the Court will proceed with its analysis of MMG's bond page as a self contained work, within MMG's larger copyright registration of its entire website.

## I.    DAMAGES

Plaintiff MMG sets forth its purported damages in a chart presented in Exhibit P-134. That chart first sets forth MMG's trial subscribers who became Freedman subscribers after October 2005, the date Freedman first published its bond page.  Warner and Habib testified that 16% of MMG trial subscribers become paying subscribers.    (Tr. Vol. 5, Habib, October 9, 2007 at 13:10-15; Tr. Vol. 8 Warner, October 22, 2007 at 128:9-16).  Additionally, the chart shows the subscription price annually, semiannually and monthly ($899, $998, and $1,199.40, respectively). It then shows the renewal rate of each type of subscriber.  This, too, was testified to by Habib. (Tr. Vol. 5, Habib, October 9, 2007 at 18:3-18).  Next, the chart in P-134 avers that 70% of MMG subscribers also subscribe to the MMG Weekly.  It then shows the subscription renewal prices.  This, too, was testified to by Habib.  (Tr. Vol. 5, Habib, October 9, 2007 at 18:19-19:24).

Based on the above, as set forth in P-134, MMG speculates that in year one MMG lost 59 potential paid subscribers, 41 of whom would also have become MMG newsletter subscribers. The chart attached to P-134 then shows that in the first year, MMG's alleged lost subscription revenue to Freedman was $47,347 plus $23,734 lost revenue from its newsletter.  In years two through five, with renewal rates of 82% of annual membership, 65% for semiannual, and 68% for monthly memberships, the chart attached to P-134 shows lost revenues of $55,326, $52,124, $32,556 and $24,767, respectively.  The total lost revenues alleged by MMG for the five years for both lost website subscribers and newsletter subscribers is $225,855  (P-134).

P-125, an April 23, 2007 Budd Larner letter to defense counsel, further sets forth the manner in which MMG calculated its damages.  While the amount of damages claimed in that letter is more than that set forth in P-134, MMG explains that the difference does not relate to the formula in P-125.  Rather, the reduction was due to a reduction in the number of subscribers who transferred from MMG to the Freedman Report after the Freedman Report first published its live bond page.  (Tr. Vol. 8 Warner, October 22, 2007 at 40:22-43:15).

Finally, P-132, an October 7, 2007 Budd Larner letter to defense counsel, attaches a list of former MMG subscribers who were on the Freedman Report's subscriber list.  That list breaks down those who were MMG trial subscribers and paid subscribers.  (See P-132 attachment at p. 1, Key).  P-133 is an October 16, 2007 letter from Budd Larner to defense counsel which eliminates some of the people included on the former MMG subscriber list attached to P-132. Also attached to P-133 is a list of additional subscribers who had been eliminated from MMG's damage claim,  because it appears that they remained members of MMG after subscribing to the Freedman Report (e.g., Rick Diaz in P-133) or because they terminated their MMG membership

-28-

before the Freedman Report first published its website (e.g., Stephen Resky in P-133).  (Tr. Vol. 8 Warner, October 22, 2007 at 46:21-47:8).

Additionally, MMG was sold in 2007.  Habib testified that the sale price was predicated on 8.7 times its net income.  (Tr. Vol. 5, Habib, October 9, 2007 at 26:20-27:1).  He further testified that the bulk of revenues lost to the Freedman Report would have been added to net income and then multiplied by 8.7.  But, in his view, being conservative, he took 80% of the first year's revenues and multiplied that by 80% to give a lost sale value of $494,729.  (Tr. Vol. 5, Habib, October 9, 2007 at 23:22-27:4; Tr. Vol. 8 Warner, October 22, 2007 at 45:24-46:9).  However, for the Court to award damages on this basis, it would have to speculate as to how the parties to the transaction would have renegotiated the sale price of MMG with higher revenues.  Also, since the multiplier is based on lost revenues, and considering the speculative nature of the evidence presented in connection with lost revenues, it would be next to impossible to determine the proper value of MMG's lost profits.  Thus, due to the speculative nature of Plaintiff's lost revenues and dependant lost sale value, the Court finds that damages cannot be awarded.[5]

III.    **CONCLUSIONS OF LAW**

     A.    **COPYRIGHT CLAIM**

          i.    **Valid Registration**

Copyright registration is a jurisdictional prerequisite to bringing an action for infringement under the Copyright Act.  See 17 U.S.C. § 411(a)(1996); Raquel v. Education Management Corp., 196 F.3d 171, 174,75 (3d Cir. 1999), vacated on other grounds, 531 U.S.

---

[5]Notwithstanding the speculative nature of MMG's lost sale value, the Court notes that Defendants argue additionally that Habib is not a party to this litigation, and that as a consequence, damages suffered by him are not applicable to this case.

952 (2000).  Pursuant to 17 U.S.C. § 408(a), "the owner of [a] copyright or of any exclusive right

in the work may obtain registration of the copyright claim by delivering to the Copyright Office

the deposit specified by this section, together with the application and fee specified by sections

409 and 708."  Although the certificate of copyright registration is prima facie evidence of the

validity of a copyright, 17 U.S.C. § 410, the presumption is rebuttable and defendant bears the

burden of proving "the invalidity of the plaintiff's copyrights." Masquerade Novelty, Inc. v.

Unique Industries, Inc., 912 F.2d 663, 668 (3d Cir. 1990).  The legislative history of section 410

describes the purpose of this provision as follows:

> The principle that a certificate represents prima facie evidence of copyright
> validity has been established in a long line of court decisions and is a sound one. It
> is true that, unlike a patent claim, a claim to copyright is not examined for basic
> validity before a certificate is issued. On the other hand, endowing a copyright
> claimant who has obtained a certificate with a rebuttable presumption of the
> validity of the copyright does not deprive the defendant in an infringement suit of
> any rights; it merely orders the burdens of proof.  The plaintiff should not ordinarily
> be forced in the first instance to prove all of the multitude of facts that underlie the
> validity of the copyright unless the defendant, by effectively challenging them,
> shifts the burden of doing so to the plaintiff.

H.R.Rep. No. 1476, 94th Cong., 2d Sess. 157, reprinted in 1976 U.S.Code. Cong. & Ad.News

5659, at 5773; see also Carol Barnhart, Inc. v. Economy Cover Corp., 773 F.2d 411, 414 (2d

Cir.1985).

Generally, section 408(b)(2) requires an applicant to deposit two complete copies of the

best edition of a published work. 17 U.S.C. § 408(b)(2).  Moreover, the application requires the

following information:

> (1) the name and address of the copyright claimant; (2) in the case of a work other
> than an anonymous or pseudonymous work, the name and nationality or domicile
> of the author or authors, and, if one or more of the authors is dead, the dates of
> their deaths; (3) if the work is anonymous or pseudonymous, the nationality or

domicile of the author or authors; (4) in the case of a work made for hire, a statement to this effect; (5) if the copyright claimant is not the author, a brief statement of how the claimant obtained ownership of the copyright; (6) the title of the work, together with any previous or alternative titles under which the work can be identified; (7) the year in which creation of the work was completed; (8) if the work has been published, the date and nation of its first publication; (9) in the case of a compilation or derivative work, an identification of any preexisting work or works that it is based on or incorporates, and a brief, general statement of the additional material covered by the copyright claim being registered; (10) in the case of a published work containing material of which copies are required by section 601 to be manufactured in the United States, the names of the persons or organizations who performed the processes specified by subsection (c) of section 601 with respect to that material, and the places where those processes were performed; and (11) any other information regarded by the Register of Copyrights as bearing upon the preparation or identification of the work or the existence, ownership, or duration of the copyright.

17 U.S.C. § 409.

Defendants contend that this Court does not have subject matter jurisdiction over this case because Plaintiff's '129 (Exhibit P-3) and '544 (Exhibit P-5) registrations are invalid. Specifically, Defendants argue that '129 is invalid for failing to state the title of the work, for failing to set forth the nation of the work, failing to identify the correct publication date of the work, and failing to deposit copies of the work claimed in the registration. In addition, Defendants contend that '544, one of the supplemental registrations, is invalid because it was not pled in the Complaint; moreover, Defendants argue that even if this could be considered, it is not a valid copyright registration because the absence of a title and failing to deposit a copy of the work claimed cannot be cured with a supplemental registration such as '544. Plaintiff, on the other hand, contends that this Court is properly vested with subject matter jurisdiction. Moreover, Plaintiff contends that any purported errors in Plaintiff's copyright application have been amended and, regardless, do not invalidate the copyright registration.

-31-

###### a.     Effect of Errors and Misrepresentations in Copyright Registration

"It is generally established that inadvertent and immaterial misstatements on a copyright application do not invalidate a copyright registration." Morelli v. Tiffany and Co., 186 F. Supp. 2d 563, 565-66 (E.D. Pa. 2002).  Indeed, the Third Circuit has held that the "view that an inadvertent omission from a registration application will render a plaintiff's copyright incapable of supporting an infringement action has not gained acceptance with the courts." Masquerade Novelty, Inc. v. Unique Indus., Inc., 912 F.2d 663, 668 n.5 (3d Cir. 1990).  "A misstatement or clerical error in the registration application if unaccompanied by fraud will not invalidate the copyright nor render the registration incapable of supporting an infringement action.  This assumes, of course, that the work would have been eligible for copyright had a correct statement of facts been contained in the registration application."  1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 7.20, at 7-197 & 198 (1990).

Indeed, once a court determines that the misstatements were inadvertent, courts generally turn to the question of whether the misstatements were material.  Morelli, 186 F. Supp. 2d at 566. "'In general, an error is immaterial if its discovery is not likely to have led the Copyright Office to refuse the application.'"  Morelli  186 F. Supp. 2d at 566 (quoting Data General Corp. v. Grumman Sys. Support. Corp., 36 F.3d 1147, 1161 (1st Cir. 1994)).  Conversely, a misstatement is material if "it might have influenced the Copyright Office's decision to issue the registration. Raquel v. Educ. Mgmt. Corp., 196 F.3d 171, 177 (3d Cir. 1999), cert. granted and judgment vacated on other grounds, 531 U.S. 952 (2000)  Significantly, the Copyright Office reviews copyright applications only to determine whether "the material deposited constitutes

copyrightable subject matter and [whether] the other legal and formal requirements . . . have been met." 17 U.S.C. § 410(a).   Thus, the Third Circuit has noted that "a misrepresentation is likely to affect the Register's decision only if it concerns the copyrightability of the work."  Gallup, Inc. v. Kenexa, 2005 WL 2271271 (3d Cir. Sept. 19, 2005).

In Masquerade, for example, the district court determined that Plaintiff had omitted material facts from its applications because it failed to "present the article[s] to the Copyright Office in a manner sufficient to demonstrate [their] function as a costume."  Id. at 668.  In discussing the district court's opinion,  the Third Circuit noted that the district court reached this conclusion because the photographs did not portray the masks being worn by human models.  On appeal, the Third Circuit held that the applications specifically identified the articles as "nose masks"; thus the court explained that they "fail[ed] to see how the Copyright Office could have been misled as to their purpose.  Because the Copyright Office had the information necessary to determine whether to register the nose masks, Masquerade was entitled to pursue its infringement action . . . ." 912 F.2d at 668.

### 1.    The Alleged Errors in MMG's Initial Application – Absence of Title, Absence of Nation – Do Not Invalidate a Copyright Registration

In Morelli v. Tiffany Co., the court considered whether an inadvertent error on a copyright application that identified the author as the sole owner rather than the company itself was immaterial.  186 F. Supp. 2d 563.  There, the court held that the error was inadvertent, minor and in good faith; consequently it was not considered material.  Id. at 566.  Here, it appears that Plaintiff's initial failure to state the title and nation in which the work was created were inadvertent minor errors.  Thus, similar to the Morelli case, these alleged errors should not

invalidate the copyright because they do not affect the validity of the copyright application.

Accordingly, the Court finds that the copyright in MMG's website is not invalidated by

Plaintiff's failure to state the correct title and nation of the work's first publication.

>    **2.    The Alleged Errors in MMG's Supplemental Copyright
>         Registrations – Error in Publication Date  – Do Not
>         Invalidate Its Copyright Registration**

Defendants argue that Plaintiff's supplemental copyright registrations are invalid due to

Plaintiff's unclean hands in allegedly misrepresenting the submitted publication date multiple

times; and that as a consequence, Plaintiff's present copyright claim must be dismissed.  The

proper grounds for supplementary registration are set forth by regulation as follows:

> Supplementary registration may be made either to correct or to amplify the
> information in a basic registration. For the purposes of this section
>
> (i) A correction is appropriate if information in the basic registration was incorrect
> at the time that basic registration was made, and the error is not one that the
> Copyright Office itself should have recognized;
>
> (ii) An amplification is appropriate:
>
> (A) To supplement or clarify the information that was required by the application
> for the basic registration and should have been provided, such as the identity of a
> co-author or co-claimant, but was omitted at the time the basic registration was
> made, or
>
> (B) To reflect changes in facts, other than those relating to transfer, license, or
> ownership of rights in the work, that have occurred since the basic registration
> was made.

37 C.F.R. § 201.5(b)(2)(i)-(ii).  Additionally, the regulations are clear as to what is an

inappropriate ground for supplemental registration and provide as follows:

> Supplementary registration is not appropriate:

-34-

(A) As an amplification, to reflect a change in ownership that occurred on or after the effective date of the basic registration or to reflect the division, allocation, licensing or transfer of rights in a work; or

(B) To correct errors in statements or notices on the copies of phonorecords of a work, or to reflect changes in the content of a work;

37 C.F.R. § 201.5(b)(2)(iii).  Compendium II of the Copyright Office, a manual on copyright practice, provides in pertinent part at § 1507.08:

An application for supplementary registration is not appropriate to correct a defect in the deposit, changes in content of the work, or error in statements . . . of the work in question. Also, where a change in the date of publication results in the applicable deposit requirements not being satisfied, a new basic registration would be in order since an appropriate deposit should be submitted.

Compendium II of the Copyright Office, § 1507.08 (1984).  Defendants argue that changing the publication date of a copyright registration is not a proper ground for supplemental registration. However, in at least one unpublished opinion, the Third Circuit has implicitly approved of the use of a supplemental registration as a vehicle to correct an erroneous publication date.  See Gallup v. Kennexa, 2005 WL 2271271, at *2 (3d Cir. September 19, 2005).

Defendants then argue that even if the Court were to hold that the change of publication was a valid ground for a supplemental registration, nonetheless the Plaintiff's copyright is invalid because the initial and supplemental registrations filed with the copyright office allegedly contained intentional misrepresentations in connection with the publication date of the works deposited.  As discussed supra, the Third Circuit has held that "a plaintiff's knowing failure to advise the Copyright Office of facts which might have led to the rejection of a registration application constitutes grounds for holding the registration invalid and incapable of supporting an infringement action."  Masquerade Novelty, Inc., 912 F.2d 663, 667 (3d Cir. 1990).  In addition,

a registration may be denied enforcement if the copyright claimant has unclean hands.  See, e.g.,

Russ Berrie & Co., Inc. v. Jerry Elsner Co. Inc., 482 F. Supp. 980, 988 (S.D.N.Y. 1980).

Defendants' reliance on Int'l Biotical Corp. v. Associated Mills, Inc., 239 F. Supp. 511

(N.D. Ill. 1964), to support the contention that Plaintiff has committed inequitable conduct is

misplaced.  In Int'l Biotical Corp. the court held that the plaintiff's copyright was unenforceable

due to inequitable conduct when the copyright owner failed to inform the Copyright Office that

its own earlier publications incorporated text and photographs that were a substantial portion of

the claimed work.  Id. at 514.  In support of its holding, the court noted that in "the copyright

application, Item 7, which requires a listing of the 'New Matter In This Version' of the material

sought to be copyrighted was left blank by [p]laintiff in each of the copyright certificates in suit."

Id.

Here, Defendants contend that MMG failed to inform the Copyright Office that the work

in which it claimed copyright protection incorporated MMG's own previously published bond

page, which was substantially identical to the July 27, 2005 bond page, except for the addition of

trendlines.  Int'l Biotical Corp. can be distinguished from the present case because in Int'l

Biotical Corp., the material that the plaintiff failed to notify the Copyright Office of was the

subject of a previous copyright and completely omitted from the application.  Even assuming that

a substantial portion of the MMG bond page was previously published, the Defendants have not

met their burden of proving inequitable conduct because the Plaintiff did include an entry in the

original application identifying preexisting work as "securities pricing quotes (including stock

and bond quotes)," and new material was identified first as "text," then subsequently amended in

a supplemental application to read: "Compilation and new material including text, graphs, charts,

tables and artwork relating to the mortgage market." (See P-1, P-4).  The Court finds that these

submissions can hardly be characterized as a willful omission, similar to what took place in Int'l

Biotical Corp.  Accordingly, the Court declines to extend the holding in Int'l Biotical Corp. to the

factual circumstances of this case.

　　　　While the Court finds Defendants' reliance on  Int'l Biotical Corp. to be unavailing, the

Court finds the recent unpublished Third Circuit opinion,  Gallup v. Kennexa, 2005 WL 2271271

(3d Cir. September 19, 2005), to be more on point.  There, the defendant argued that

misrepresentations in Gallup's application invalidated the registration, but the Third Circuit held

that the misrepresentations – including the dates of creation and publication – were immaterial

and that a certification of registration would have issued regardless.  2005 WL 2271271, at *2.

Moreover, the court noted that "a certificate did issue after Gallup filed an application for

supplementary registration correcting its initial application [and noted that defendant's]

insinuation that the supplementary registration might have been denied had the Register

examined the application more closely . . . is baseless."  Id.  The court did note that although it

was "troubled by the possibility that Gallup's misrepresentations may have been intentional, it is

not clear that even knowing misrepresentations can void a copyright registration when the

Register has not relied on them."  Id.  For all these reasons, the court concluded that Gallup's

misrepresentations did not invalidate the registration.

　　　　The present case is similar to the Gallup case because here Plaintiff also allegedly

misrepresented the correct date of publication.  And while this Court shares the same

reservations as the Gallup court, it is inclined to adopt the same rationale, finding that an

erroneous publication date is not material to copyright registration, particularly where, just like in

<u>Gallup</u>, Plaintiff filed supplemental amendments to the copyright registration which appear to have cured the initial defects of the copyright registration.  Therefore the Court declines to find that the MMG copyright registration is invalid even if the misrepresentation could be deemed intentional because the publication date is not material to copyrightability of the work.

> **3.    The Alleged Failure in MMG's Initial and Supplemental Copyright Registrations – To Identify Whether the Work was a Compilation or Derivative Work – Does Not Invalidate the Copyright Registration**

A failure to disclose that a work is a derivative or compilation causes rejection of the application only if the Copyright Office, when apprised of the preexisting material, would have rejected the application on that basis.  <u>See</u>, <u>e.g.</u>, <u>Cannon Group, Inc. v. Better Bags Inc.</u>, 250 F. Supp. 2d 893, 898-99 (S.D. Ohio 2003); <u>Santrayall v. Burrell</u>, 993 F. Supp. 2d 173, 176 (S.D.N.Y. 1998); <u>O.T. Pickell Bldrs., Inc.</u>, 1998 WL 664949 at 6; <u>Midway Mfg. Co. v. Bandai-America, Inc.</u>, 546 F. Supp.  125, 140 (D.N.J. 1982) (failure to identify preexisting work did not invalidate copyright when there was no harm).  Accordingly, a copyright registration will not be invalidated when the Copyright Office is on notice that a work to be registered is a derivative work or compilation, thus permitting it to make further inquiry if necessary.  <u>Dynamic Solutions, Inc. v. Planning & Control, Inc.</u>, 646 F .Supp. 1329, 1343 (S.D.N.Y. 1986).

Here, box 6 of MMG's original copyright application and registration identified that the MMG Website was a derivative work or compilation by setting forth a description of material added to the work as "Text."  This description was consistent with the statutory requirements of providing only a "brief, general statement."  17 U.S.C. § 409(9).  Therefore the Copyright Office was on notice that the MMG website was a derivative work or a compilation and could have

made further inquiry if necessary, just as was the case in <u>Dynamic Solutions, Inc.</u>  Additionally, MMG's supplemental application amended this information by identifying preexisting material in box 6 as "financial data from various sources" and material added to this work as "compilation and new material including text, graphs, charts, tables and artwork relating to the mortgage market."  (<u>See</u> P-2).  The Copyright Office issued the supplemental registration and never made any requests in that regard.  Therefore, MMG's copyright registration cannot be invalidated on this basis.

> **b.    Plaintiff's alleged deposit of a different work from the work identified in the copyright registration does not invalidate the copyright**

In order to obtain a valid copyright registration for a published work, an applicant must submit two complete copies of the work. 17 U.S.C. § 408(b).  In light of this requirement, Defendants argue that Plaintiff did not file a deposit copy of the work for which registration was sought.  Indeed, in the initial application for copyright, Plaintiff claimed that the date of first publication was March 1, 2001;  however, the deposit copies filed with the copyright office had date stamps of November 29, 2005.  Defendants contend that the deposit copy was not the March 1, 2001 work and was materially different from the March 1, 2001 work.  For example, Defendants contend that the material deposited with the Copyright Office included financial data from a different date.  Further, Defendants contend that Plaintiff acknowledged that the website changed between 2001 and 2003, and that it was only after it apprised Plaintiff of the invalidity of the copyright registration, that Plaintiff sought to change the subject matter of the registration to a different work which was first published on April 28, 2003.  Indeed, on July 11, 2006, '544, which is a supplement to '129, changes the date of section 3(a), the year in which creation of this

work was completed, from 2001 to 2003.  Similarly, section 3(b) is changed from March 1, 2001
to April 28, 2003.  Another supplemental registration was filed on January 18, 2007, to reflect
July 27, 2005 as the date of first publication.

Defendants contend that in light of these varying publication dates, Plaintiff's intent was
to register a work other than the deposit copy, thus, Defendants argue that the copyright
registration is invalid.  Specifically, Defendants contend that Plaintiff filed suit based upon an
initial copyright registration for the March 1, 2001 website, however, that Plaintiff is attempting
to sue Defendants for infringing the November 29, 2005 website.  Defendants aver that the
Freedman Report's website was published before November 29, 2005, thus arguing that they
could not have copied Plaintiff's registered website if was first published on November 29, 2005.
(See P-102).

In the alternative, Defendants argue that Plaintiff's copyright registration is invalid
because even if the Court accepts the date of publication for the MMG website as July 27, 2005,
as amended in the final supplemental registration, (See P-102), and not the November 29, 2005
date, as shown on the deposit copy print outs, the deposited MMG bond sample page is not the
actual page from July 27, 2005 and is merely a reconstruction.  Warner has testified that the
deposit copy of the July 27, 2005 MMG sample bond page is an exact copy of the bond page
from that date, taken with a program called "Snaggit." (Tr. April 9, 2007, 95:25 - 96:16).
However, during trial, testimony was taken that attempts to cast doubt upon whether it is an
original snapshot of the MMG bond page from that date.  That testimony illustrates that the
financial data in the July 27, 2005 MMG bond page deposited with the Copyright Office is
actually from May 24, 2004, not July 27, 2005.  (Tr. October 25, 2007, 135:2-140:7).

Additionally, Defendants seek to cast doubt upon the credibility of Warner, by showing that his testimony regarding the similarity between the deposited MMG sample bond page that Plaintiff claims was first published July 27, 2005, and the actual November 29, 2005 MMG bond page deposited was incorrect.  Defendants contend that, despite Mr. Warner's testimony that the only difference between the actual and sample bond pages is financial data, at least two differences existed between the actual (11/29/2005) and sample (7/27/2005) bond pages deposited:  first, that the customization panel differed in appearance (although it maintained the same customization options); and second, that there was an extra tab in the November 29, 2005 version to display data for the 9:30am time frame.  But, as discussed <u>supra</u>, the Court finds that the difference in financial data is consistent with the representation that the bond page submitted was a sample from the website and not a live feed.  Therefore, it is inconsequential that the financial data was taken from a different date.  Plaintiff does not contend that the financial information is from that date, nor do they seek protection for the underlying financial information, Plaintiff merely contends that July 27, 2005 was the first date of publication of the bond page with its new feature incorporating trendlines.  Furthermore, the Court finds that Warner's credibility as to his overall testimony is not tarnished by his oversight of a few minor changes other than financial information between the actual (11/29/2005) and sample (7/27/2005) bond pages in the deposit copy.

Defendants rely on <u>Kodadek v. MTV Networks</u>, 152 F.3d 1209, 1211 (9th Cir. 1998), and <u>Coles v. Wonder</u>, 283 F.3d 798 (9th Cir. 2002), to support their contention that Plaintiff's copyright should be invalidated because of the abovementioned alleged defects in the deposit copies.  In <u>Kodadek</u>, the court held that Plaintiff's reconstruction of cartoon characters from

memory did not satisfy the copyright registration requirements.  Specifically, the court noted that

pursuant to 17 U.S.C. 408(b), an applicant for copyright registration must deposit copies of his

work and that this requirement only permits "bona fide" copies of the original work.  In

Kodadek, the artist contended that although he no longer had the original drawings, he was so

familiar with initial drawings, that he could draw identical copies from memory.  The court held

that these reproductions for purposes of obtaining copyright registration were insufficient;

moreover, the court held that "any 'copy' deposited as part of an application for a certificate of

copyright registration must be virtually identical to the original and must have been produced by

directly referring to the original."  Kodadek, 152 F.3d at 1212.

In Cole, the Ninth Circuit held that a recording of a musical composition that was

deposited with an application for copyright registration was a reconstruction of a composition,

which had allegedly been created eight years earlier, rather than a copy, and thus did not satisfy

requirements for copyright registration. There, the court held that had the Plaintiff

> been able to establish that he made the 1990 recording after listening to an audio
> copy of his 1982 rendition of [the song], he could have met the deposit
> requirement and his copyright would have been valid from the date listed on his
> application.  Likewise, had he made his 1990 recording after reviewing a tear
> sheet or other written summary that dated from 1982, he could have satisfied the
> deposit requirement . . . however, [plaintiff] did not refer to the original work in
> producing the recording . . . . Thus, the 1990 recording must be viewed as a
> reconstruction only, not a copy, and therefore he could not receive a valid
> copyright registration in the 1982 version of the song.

Coles, 283 F.3d at 802.

Defendants' reliance on Kodadek and Coles is misplaced because in those two cases the

main impetus behind the court's invalidation of the plaintiff's copyright was that the deposited

copies were reconstructions of that to which the applicants were claiming copyright protection.

-42-

This is not what happened in the present case.  Firstly, even assuming that there were material differences between the deposit copy and the MMG website on the original copyright registration's March 1, 2001 publication date, this publication date error was corrected by supplemental registrations; furthermore, Plaintiff does not contend that the March 1, 2001 website has been infringed.  (See P-2, P-102).

Secondly, looking towards the MMG bond page at issue, it cannot be said that the deposit copy was a reconstruction of the July 27, 2005 MMG bond page.  Here, the facts differ from what occurred in Kodadek and Coles, because according to Warner, the sample MMG bond page from July 27, 2005, was a snapshot of the actual sample bond page on that date, not a reconstruction of the web page.  (See Tr. April 9, 2007 at 91:6-17).  The fact that the financial data is different, largely because indeed it is dynamic and not static, is unavailing to the Defendants and irrelevant to the issue of copyright protection for the MMG bond page.[6]  Also, unlike the situation in Kodedek, where the plaintiff reconstructed the deposit cartoon figure from memory, here, using financial data as a filler would not necessarily mean that the copyrighted sections of the deposited MMG bond page were contrived from memory.  Additionally, unlike the deposit copy in Coles, which was deemed a reconstruction because it was made 8 years after the original and the author did not refer to the original work when producing it, here, it is not alleged that the July 27, 2005 MMG sample bond page was constructed from memory, merely that the deposit copy is a different work from the July 27, 2005 bond page by virtue of the different financial data and the November 29, 2005 date located at the bottom of the page,

_____

[6]This is especially true since it appears that the deposited bond page, regardless of the date of publication,  substantially represents the content that was allegedly infringed.  See supra Gallup discussion, at p. 37-38.

designating when it was printed.  The Court finds that these arguments fail to meet the mark in overcoming the presumption of validity in a copyright registration.  Therefore, the Court declines to extend the holdings in <u>Kodadek</u> and <u>Coles</u> to the present case.

In conducting its own survey of relevant case law, where it is alleged that the deposit copies differed from the actual work as of its stated publication date, the Court has found many relevant cases.  In <u>Geoscan, Inc. of Texas v. Geotrace Technologies, Inc.</u>, 226 F.3d 387 (5th Cir. 2000), the court held that the registration of a copyright was incomplete because a party "had not submitted for deposit the original source codes for its software, instead [the party] had submitted later versions of source code."  <u>Id.</u> at 393.  There, the case turned on the plaintiff's submission of later versions of the code instead of the original source code.  Indeed, the court held that "although Scan had filed an application, paid a fee, and made a deposit with the Copyright Office, the deposit was not a complete copy of the original source code, thus Scan had not fulfilled all the statutory formalities necessary to register its copyright and [demonstrate] 'ownership' in its software for the purposes of a copyright infringement claim."  <u>Id.</u>  For these reasons, the Fifth Circuit upheld the district court's grant of summary judgment to defendant on plaintiff's copyright infringement claims.

In <u>Dynamic Solutions Inc. v. Planning and Control, Inc</u>., 646 F. Supp. 1329 (S.D.N.Y. 1986), the defendants claimed that plaintiff's copyright was invalid because plaintiff failed to deposit a copy of its work with the Copyright Office pursuant to 17 U.S.C. 408(b).  The court explained that when the plaintiff filed its copyright registration, it gave the date of creation and publication as 1983 and 1984.  The filings were accompanied by copies of the first and last 25 pages of the programs.  However, Plaintiff did not deposit versions of the programs that existed

in 1983 and 1984; instead, Plaintiff deposited "somewhat revised versions that existed at the time

of filing in February 1986."  <u>Id.</u> at 1341.  The Court held that

> although defendants characterize plaintiff's behavior as a complete failure to
> deposit the source codes for which they claim protection, it can just as easily be
> characterized as an error in the dates listed on the registration form.  Errors on the
> registration application do not affect plaintiff's right to sue for infringement
> unless they are knowing and might have caused the Copyright Office to reject the
> application.

<u>Id.</u>  The court reasoned that "[h]ere . . . plaintiff has deposited with the Copyright Office the

versions of the programs which defendants were 'caught' using in 1986 and which it asserts were

infringed.  The erroneous date entered on the registration form does not affect Plaintiff's right to

sue."  <u>Id.</u> at 1342.

In <u>Gallup v. Kenexa Corp</u>., 149 Fed. Appx. 94 (3d Cir. 2005), the Third Circuit held that

the plaintiff clearly satisfied the deposit requirements of 17 U.S.C. § 408(b)(2) where it was

undisputed that plaintiff Gallup owned a valid copyright in the 1998 version of the survey and

where it was undisputed that Gallup deposited two copies of the 1998 version as part of its

application for registration.  Indeed, the court noted that "the effectiveness of this deposit would

not be vitiated even if Kenexa could show that Gallup had intended to deposit some other work

instead.  Because Gallup sought to enforce a copyright in the same work that it deposited, the

case bore little resemblance to the authorities cited by Kenexa.  <u>See</u> <u>Coles v. Wonder</u>, 283 F.3d

798 (6th Cir.2002); <u>Geoscan, Inc. of Tex. v. Geotrace Techs.</u>, Inc., 226 F.3d 387 (2d Cir.2000);

<u>Kodadek v. MTV Networks, Inc.</u>, 152 F.3d 1209 (9th Cir.1998).

In each of the foregoing cases, the plaintiff was trying to enforce a copyright in work X

but had deposited a copy of work Y.  Work Y was either a reconstruction of work X, <u>see</u> <u>Coles</u>,

283 F.3d at 802; Kodadek, 152 F.3d at 1212, or a revised version of work X, see Geoscan, 226

F.3d at 393; Dynamic Solutions Inc., 646 F. Supp. 1329.  The courts in Coles, Kodadek, and

Geoscan each held that a plaintiff's registration could not support an infringement action when

the works deposited were not "bona fide copies of the original work" in which the copyright was

claimed.  Geoscan, 226 F.3d at 393.  However, these cases cannot guide this Court's decision,

because here, similar to the situations in Gallup and Dynamic Solutions Inc., the Plaintiff

deposited the same work that it now claims was infringed.

    In Gallup the court noted that the facts of its case more closely resembled those of

Dynamic Solutions, Inc.  As discussed supra, in Dynamic Solutions, the plaintiff had deposited

the 1986 versions of two software programs, but its application stated that they were created and

published in 1983 and 1984.  The court found this discrepancy irrelevant to whether the deposit

requirement was satisfied.  According to the court, the relevant fact was that the plaintiff had

deposited "the versions of the programs which defendants were 'caught' using in 1986 and which

it asserts were infringed." Id. at 1342.  In other words, the deposit could support the action for

infringement because the plaintiff had deposited the very work on which the litigation was based.

    Finally, the Gallup court considered the defendant's argument that misrepresentations in

plaintiff's application invalidated the registration.  The Third Circuit did not agree; indeed, the

court noted that "an otherwise valid registration is not jeopardized by inadvertent, immaterial

errors in an application.  A misstatement is material if 'it might have influenced the Copyright

Office's decision to issue the registration." Id. at 396 (citations omitted).  There, the court held

that any misrepresentations were immaterial; indeed, the court noted that the "survey would have

been copyrightable regardless of when it was created and published, and a certificate of

registration would have issued in either case." Id.  Furthermore, a revised certificate did issue after Gallup filed an application for supplementary registration correcting its initial application. The Third Circuit went on to acknowledge that: "[a]lthough we are troubled by the possibility that Gallup's misrepresentations may have been intentional, it is not clear that even knowing misrepresentations can void a copyright registration where the Register has not relied on them." Id.  The Gallup court concluded that

> [t]he standard for invalidating a copyright registration in this Circuit is the 'knowing failure to advise the Copyright Office of facts which might have led to the rejection of a registration application.'. . . For the reasons given above, the Register undoubtedly would have issued the certificate whether or not Gallup had misrepresented the dates of creation and publication. Gallup's misrepresentations thus could not have voided its registration even if they were knowingly made.

Id.  Accordingly, since MMG claims that Defendants infringed the website that was actually deposited in its application, a cause of action for copyright infringement is proper.

### c.   The Registered MMG bond page as a Valid Compilation or Derivation

Plaintiff asserts that the MMG bond page is a copyrightable "compilation" under the applicable copyright laws.  However, Defendants contend that the deposited website does not meet the definition of a "compilation," and that furthermore, Plaintiff acknowledged that it is a derivative work, not a compilation in its copyright application.  Defendants support this contention by referencing the initial and numerous supplemental copyright applications filed in this case.  (See P-1 (initial application), P-2, P-4, P-102 (supplemental applications)).  The Copyright Act states in pertinent part:

> A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such

a way that the resulting work as a whole constitutes an original work of authorship.  The term "compilation" includes collective works.

. . . .

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted.  A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101.

The Court will begin its inquiry by analyzing the MMG bond page, as deposited with the Copyright Office, to determine if it is entitled to copyright protection as a compilation or derivation.  The MMG bond page consists of a compendium of analytical tools that are already in the public domain, including: bond prices, Japanese candlestick charts, stochastics, resistance and support analysis, trendlines and moving averages.  These features were combined by Habib, so that all this information can be put together in an original manner unique to the mortgage industry.  MMG's bond table features four fixed rate mortgage backed securities, plus the United States 10 year Treasury note on a dynamic bond table.  It has a refresh rate of once every two minutes as opposed to streaming updates so that MMG could widen its potential customer base to users with computers that lacked the ability to display streaming updates.

Selection, arrangement, and presentation of facts and analytical tools in the public domain are copyrightable.  See Feist Publications, Inc. v. Rural Telephone Service Company, 499 U.S. 340, 345 (1991) (holding that market prices of securities are not copyrightable, but compilations of facts generally are copyrightable).  The Feist court observed that "the requisite level of

creativity is extremely low; even a slight amount will suffice." Id.  "[I]t is the combination of elements [in the public domain], or particular novel twists given to them, that supply the minimum originality required for copyright protection." Buckelew v. Hawkins, Ash, Baptie & Co., LLP, 329 F.3d 923, 929 (7th Cir. 2003).

In the present case, MMG's bond page contains a dynamic bond table and candlestick chart which are customizable in various different ways and include specific original features. The customization options combined with the arrangement of dynamic charts and tables is a unique creative expression.  The bond price data combined with the specific set of analytical tools, and selection of refresh rates constitute an original compilation entitled to copyright protection.  However, since the majority of the features found in the MMG bond page preceded the July 27, 2005 publication date, as amended in the final supplemental registration, the Court must characterize the MMG bond page at that time as a derivation of its predecessor bond pages.

Defendants refer to Circular 66 and Circular 14 to support their contention that the deposited July 27, 2005 sample bond page is a derivative work.  In Circular 66, "Copyright Registration for Online Works," the Copyright Office states under the heading: "What the Registration of an Online Work Covers," that

> For all online works other than computer programs and databases, the registration will extend only to the copyrightable content of the *work as received in the Copyright Office and identified as the subject of the claim*. The application for registration should exclude any material that has been previously registered or published or that is in the public domain.  For published works, the registration should be limited *to the content of the work asserted to be published on the date given on the application*.

Circular 66, "Copyright Registration for Online Works."  Additionally, under the heading "Revisions and Updates," the circular states that

> Many works transmitted online, such as websites, are revised or updated frequently. Generally, copyrightable revisions to online works that are published on separate days *must each be registered individually*, with a separate application and filing fee (*unless it meets the requirements in the following two sections*). Registration of a revised version covers only the new or revised material added. The version of the work that is deposited should be the same version described on the application; thus, the title and dates on the application should correspond with those on the deposit copy. See Circular 14, Copyright Registration for Derivative Works, for important additional information on registering revised works.

Circular 66, "Copyright Registration for Online Works."

Copyright Circular 14, "Copyright Registration for Derivative Works," gives copyright applicants direction on how to apply for a copyright registration for derivative works. It instructs that when an applicant is filling out the copyright application that, with respect to box 6a, the applicant should "[b]riefly, in general terms, describe the preexisting material that has been recast, transformed, or adapted . . . *Do not complete this space for compilations*." (Copyright Circular 14, "Copyright Registration for Derivative Works") (emphasis added). The original copyright application, admitted into evidence as P-1, did have an entry for box 6a. And during trial, Inserra, (counsel who submitted the initial and first supplemental registration), testified that the supplemental copyright application, admitted into evidence as P-2, was intended to have the same 6a entry from P-1 carried over into it.

Defendants then argue that, by virtue of the fact that the MMG copyright application has section 6a filled out and based upon testimony given at trial indicating that there were previous versions of the July 27, 2005 MMG bond page, that the copyright registration is a derivative work and not an original compilation. (See Tr. April 9, 2007 Warner Cross at p. 106:3-110:8; 130:20-138:20 ). As such, Defendants contend that Circular 66, "Revisions and Updates" governs and that there is no copyright protection for preexisting elements of the MMG bond page

that have an earlier publication date as that which was claimed in the registration.  Specifically, Defendants argue that the copyrighted website has a publication date of November 29, 2005, and is a derivative work, which in accordance with Circular 66, would exclude copyright protection for virtually every element of the MMG bond page.  The Court finds that the supplemental registration, admitted into evidence as P-102, properly amended the original registration's publication date to July 27, 2005.  However, this still means that the deposited sample MMG bond page is a derivative work of preexisting versions of the July 27, 2005 bond page; as such, the Court must address the scope of protection afforded to preexisting works.

### ii.    Copyright Protection for Preexisting Works

Defendants argue that regardless of whether the deposited MMG website is characterized as a compilation or a derivative work, its copyright registration does not cover preexisting works.  The thrust of their argument is that even if the registration is deemed valid by the Court, the deposit copy still has a publication date of November 29, 2005.  The alleged copyright infringement took place between July 2005 and November 2005, therefore Defendants contend that to maintain an action under the copyright laws, the Court must find that protection is afforded to preexisting works of the November 29, 2005 website.  This argument is short circuited because the copyright registration's revised publication date of July 27, 2005 precedes the alleged infringing conduct.  Nonetheless, the Court must still inquire as to whether copyright protection is afforded to preexisting works, as the July 27, 2005 MMG bond page is a derivation of previous versions.

Defendants rely on Section 103 of the Copyright Act and Circular 66, to support their argument that preexisting works of a registered website should not be afforded copyright protection.  Section 103 of the Copyright Act states that:

> The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

17 U.S.C. § 103(b).  Circular 66, "Copyright Registration for Online Works," is instructive, but not dispositive in resolving whether a preexisting work should be afforded copyright protection when a later made derivative work or compilation is properly registered.  See supra Copyright Office Circular 66, "Copyright Registration for Online Works".

Although Copyright Office Circulars do not have the force of a statute, courts have considered them to be a "fair summary of the law."  Kitchens of Sara Lee v. Nifty Foods Corp., 266 F.2d 541, 544 (2d Cir. 1959); see Ets-Hokin v. Skyy Spiits, Inc., 225 F.3d 1068, 1081 n. 14 (9th Cir. 2003).  "The circulars provided by the Copyright Office are intended simply to aid the public in understanding copyright law."  Palladium Music, Inc. v. EatSleepMusic, Inc., 398 F.3d 1193, 1198 n.6 (10th Cir. 2005); see Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc., 797 F.2d 1222, 1242 n. 38 (3d Cir.1986) (where the court noted that "Copyright Office circulars are not technical documents, but are 'intended to present simple explanations of the law,' for lay persons," refusing to give deference to a circular).  "While they certainly may supplement our understanding of what is required for effective registration, they are hardly more binding on

statutory interpretation than a plain reading of the Copyright Act itself, or the Copyright regulations, codified at 37 C.F.R. § 202 et al." Id. (citations omitted).

Here, it appears that Circular 66 gives direct support to the Defendants' argument that there should not be copyright protection for preexisting works of registered websites. Unfortunately, there is a dearth of case law that discusses the relevance and application of Circular 66. From a practical perspective it would be nearly impossible for a website to register each daily version of its website because a website, by its very nature, changes constantly. This makes the Court ponder whether Circular 66 was written to apply to content-driven websites, (i.e. - websites that resemble magazines in that they publish articles by authors where the substance of the website itself changes depending on the articles published), as opposed to application driven websites where the same selection and arrangement of tools are used to populate data which is dynamically displayed through automated subscription services to various data streams (i.e. - websites that poll securities pricing data). If it is the former, then it would present a consistent outcome with already existing case law which endorses copyright protection for preexisting works, while requiring a separate registration for new works. The latter introduces an inconsistency with the traditional notions of how preexisting works are treated, which is discussed infra.

Plaintiff contends that the MMG bond page is a self contained part of the entire registered work and therefore should be afforded copyright protection even if the Court finds, as it did here, that portions of the MMG bond page consist of preexisting material. The relevant copyright regulations set forth:

> For the purpose of registration on a single application and upon payment of a
> single registration fee, the following shall be considered a single work:
>
> (A) In the case of published works: all copyrightable elements that are otherwise
> recognizable as self-contained works, that are included in a single unit of
> publication, and in which the copyright claimant is the same.

37 C.F.R. § 202.3(b)(4)(i)(A).  An accompanying line of cases lends support to the notion that

self-contained preexisting works should receive copyright protection if created by the same

author.  In particular,  Kay Berry v. Taylor Gifts, 421 F.3d 199, 206 n.2 (3d Cir. 2005), provides

an informative discussion of the issue in question.  In Kay Berry, Inc., the government filed an

amicus brief at the request of the Third Circuit; this brief argued "that only those individual

works first published in the single work [should] be covered by the single work registration." See

17 U.S.C. § 101.  Accordingly, the amicus brief contended that a copyright "extends only to the

material contributed by the author of such work, as distinguished from the preexisting material

employed in the work." See 17 U.S.C. § 103(b).

However, while the court did not squarely address the issue, it went on to cite decisions

from the Third Circuit and like cases from other circuits that were in contradiction of the

Government's position.  These cases counseled that registration of a collective work is sufficient

to support an action for infringement of the underlying self-contained parts, as long as they are

created by the same author.  Educ. Testing Servs. v. Katzman, 793 F.2d 533, 539 (3d Cir. 1986)

("Although compilations or 'collective' works may include uncopyrightable works, as well as

previously copyrighted works, the fact that the registration was for compilations does not

preclude protection for the material therein contributed by the author."); see also Xoom, Inc. v.

Imageline, Inc., 323 F.3d 279,  284 (4th Cir. 2004) (owner of copyright in the collective work and

underlying works was the same and therefore could maintain an action for infringement of the underlying works); Streetwise Maps v. VanDam, Inc., 159 F.3d 739, 747 (2d Cir.1998) (where the copyright owners are the same, a registration certificate for a later work is sufficient to maintain an action for infringement of the pre-existing work); see 2-7 Melville B. Nimmer & David Nimmer,  Nimmer on Copyright, § 7.16[B][2][c] (2008).

        Streetwise Maps, a case cited by the Third Circuit in Kay Berry, Inc., is particularly instructive on this topic.  There the copyright holder relied "upon a certificate of copyright registration filed on August 3, 1989.  That certificate states that the work it protects is derivative of a 'Streetwise Manhattan map carrying a copyright notice date of 1984, 1985.'  The supposed additions to the earlier map were depictions of the subway and bus systems."  Streetwise Maps, 159 F.3d at 746-47.  The alleged copyright infringers argued "that this registration certificate only covered the subway and bus notations on the 1988 map, and not the pre-existing map referred to in the certificate.  Thus, [the alleged copyright infringers concluded that because] Streetwise did not offer proof of registration of the earlier map itself . . . it cannot now sustain an infringement action for their alleged infringement of the earlier map."  Id.  However, the court held that:

> because Streetwise is the owner of the copyright of both the derivative and preexisting work, the registration certificate relating to the derivative work in this circumstance will suffice to permit it to maintain an action for infringement based on defendants' infringement of the preexisting work. That plaintiff need not produce a separate registration relating to the pre-existing work is a proposition which finds support in other courts and in the writings of scholarly commentators.

Id. (citing Greenwich Film Prods. v. DRG Records, Inc., 833 F. Supp. 248, 251-52

(S.D.N.Y.1993); 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 7.16[B][2];

Woods v. Universal City Studios, Inc., 920 F. Supp. 62, 64 (S.D.N.Y.1996)).

 In this case the MMG bond page was registered with a first publication date of July 27,

2005.  Similar to the copyright holder in Streetwise Maps, Plaintiff holds a valid copyright

registration to a derivative work which contains a preexisting work by the same author.  Thus,

because the July 27, 2005 bond page (with trendlines) is derivative of the bond page that existed

previously (without trendlines) and is owned by the same copyright holder, it too is entitled to

copyright protection.  Similarly, in Kay Berry, Inc., the Third Circuit strongly implied that such

protection should be afforded to preexisting works and this Court agrees, holding that copyright

protection is extended to self contained works containing preexisting material created by the

same author.

 Even if the Court holds, as it does here, that preexisting online works by the same author

should be given copyright protection when a derivative work is registered, Defendants argue,

citing I.M.S. Inquiry Management Systems, Ltd. v. Berkshire, 307 F. Supp. 2d 521, 527

(S.D.N.Y. 2004), that the preexisting works must be referenced in the copyright registration.  In

that case, the registration certificate at issue stated that the work was completed and first

published in 2003.  Id. at 527.  The defendant was accused of infringing the website of March

2002, which was not the subject of the registration certificate.  Id. at 529.  The court concluded:

first, that the work infringed was not the work that was registered; and second, that even if the

registered work was a derivative work or compilation, and even if a registered derivative work or

compilation afforded protection to preexisting works by the same author, no protection was

available because the registration certificate did not identify the preexisting (2002) website as a

work on which the registered (2003) work was based.  Id. at 529-30.  The court stated that

> we find that the portion of the Registration Certificate requiring the identification
> of "Preexisting Material" would have to refer to the preexisting matter that is the
> basis of this infringement action. Unlike the plaintiff in Streetwise Maps, the
> plaintiff here does not identify the preexisting work that is the foundation of this
> action.  See Well-Made, 354 F.3d 112, 115-16.  And like in Well-Made,"the
> copied work here is not listed in any copyright registration."  Id. The only
> indication that the Registration Certificate protects work that existed in March of
> 2002 are plaintiff's current protestations to this effect. This is not sufficient to
> confer subject matter jurisdiction on this Court.

Id. at 529.

Although I.M.S. Inquiry Management Systems, Ltd. is instructive in its analysis of what

is required disclosure in a derivative application to afford copyright protection to a preexisting

work, it is not necessary for the Court to reach this issue because unlike the case in I.M.S. Inquiry

Management Systems, Ltd., here the deposited work was the same as the work that was

infringed.  The present case is more analogous to the cases of Gallup and Dynamic, discussed

supra, where the court found subject matter jurisdiction because the deposited copy was the same

copy as the one the plaintiffs alleged was being infringed.

Furthermore, even if the Court reached the question of whether the copyright registration

did identify its preexisting work, in this case the Plaintiff did identify it in its application. The

Plaintiff specifically filled in box 6a, which identifies preexisting work as "securities pricing

quotes (including stock and bond quotes)," and box 6b, which identifies the new material added

as "text," which was subsequently amended in a supplemental application to read "[c]ompilation

and new material including text, graphs, charts, tables and artwork relating to the mortgage

market."  (See P-1, P-4).  This is a departure from the situation in I.M.S. Inquiry Management

Systems, Ltd., where the copyright holder omitted to fill in the section "calling for the designation of any preexisting work on which the registered work is based." 307 F. Supp. 2d at 530. Thus, although the Court finds that the information provided by Plaintiff was minimal, it was sufficient to put the Copyright Office on notice that the website was based on preexisting material.

### iii.    COPYRIGHT INFRINGEMENT

"To establish a claim of copyright infringement, a plaintiff must establish: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." Dun & Bradstreet Software Services, Inc. v. Grace Consulting., 307 F.3d 197, 206 (3d Cir. 2002); see Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). The Court has already discussed whether Plaintiff's copyright registration is valid. See supra at pp. 29-51. Next it will discuss whether Plaintiff has met its burden of establishing proper ownership, followed by a discussion of whether Plaintiff has established that the Defendants made unauthorized copies of the copyrighted work.

### a.    Ownership of the MMG Website Created before 2003

The first step in establishing a claim of copyright infringement requires the Plaintiff to show ownership of the copyright in question. Id. When "[a] copyright registration certificate issue[s] within five years of the work's publication date [it] creates [a rebuttable] presumption" of copyright ownership. Bieg v. Hovnanian Enterprises, Inc., 157 F. Supp. 2d 475, 479 (E.D. Pa. 2001); see 17 U.S.C. § 410(c); Schiffer Publishing, Ltd. v. Chronicle Books, LLC, 350 F. Supp. 2d 613, 616-17 (E.D. Pa. 2004). "This presumption is rebuttable and 'shifts to the defendant the burden to prove the invalidity of the plaintiff's copyrights.'" Schiffer Publishing, Ltd. v.

Chronicle Books, LLC, 350 F. Supp. 2d 613, 616-17 (E.D. Pa. 2004) (quoting Masquerade

Novelty, Inc. v. Unique Indus., Inc., 912 F.2d 663, 668-69 (3d Cir.1990)).  Defendants contend

that extensive testimony has been given at trial indicating that before 2003 the MMG website

was created by independent contractors and that Plaintiff has failed to show that it had copyright

ownership of the website created before 2003.  (Tr. Vol. 1, Warner, April 9, 2007 at p.

119:11-120:3; Tr. Vol 7, Warner, October 11, 2007 at p. 50:11-56:11).  One way to establish

ownership of a copyrighted work is by showing that the conditions for a "work made for hire" are

met.  A "work made for hire" consists of

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a
> collective work, as a part of a motion picture or other audiovisual work, as a
> translation, as a supplementary work, as a compilation, as an instructional text, as
> a test, as answer material for a test, or as an atlas, *if the parties expressly agree in
> a written instrument signed by them that the work shall be considered a work
> made for hire*. For the purpose of the foregoing sentence, a "supplementary work"
> is a work prepared for publication as a secondary adjunct to a work by another
> author for the purpose of introducing, concluding, illustrating, explaining,
> revising, commenting upon, or assisting in the use of the other work, such as
> forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes,
> musical arrangements, answer material for tests, bibliographies, appendixes, and
> indexes, and an "instructional text" is a literary, pictorial, or graphic work
> prepared for publication and with the purpose of use in systematic instructional
> activities.

17 U.S.C. § 101 (emphasis added).

Since, here, Defendants allege that independent contractors created the MMG website

prior to 2003, (See Tr. April 9, 2007, 119:11-120:3; Tr. October 11, 2007, 50:11-56:11), the

second section of the "work made for hire" definition is relevant.  Defendants correctly state that

when an independent contractor is creating a work made for hire there must be either a written

agreement stating that the work is a work made for hire, or a written assignment of the copyright. See 17 U.S.C. § 101; 17 U.S.C. § 204. Here, Defendants allege that no such document exists, and as a result, because MMG allegedly has not shown the differences between the preexisting 2003 website and the work in which a copyright is claimed, it is not entitled to copyright protection. However, the Court finds that it is not necessary for Plaintiff make such a comparison to maintain this action for copyright infringement. There is a valid registration that has issued in regard to the MMG bond page and the publication date is represented as July 27, 2005. This is within 5 years of the last supplemental copyright registration, which issued January 18, 2007. Therefore Plaintiff is entitled to a presumption of copyright ownership.

As stated above, testimony demonstrates that there were third party contractors who worked on the web development of the MMG website prior to 2003, however it is Defendants' burden to establish that MMG's bond page, in the form submitted in its copyright registration, is attributed to other authors. Defendants attempt to rebut Plaintiff's copyright ownership in its bond page by eliciting testimony as to certain features present on MMG's bond page prior to the 2003 redesign. However, Warner testified that the first time that the bond table, candlestick chart, and customization chart appeared on the MMG Website, in the form set forth in the copyright registration's deposit copy, is the latter part of 2003. (Tr. Vol. 1, Warner, April 9, 2007 at p. 88:6 - 89:1). Furthermore, on cross examination, while Warner did testify that a bond page existed prior to the 2003 redesign, he did not recall whether certain options (such as stochastic charts, a customizable time frame or a choice of what financial analysis tools to appear on the chart) were a part of the website prior to 2003, (Tr. Vol 7, Warner, October 11, 2007 at p. 4:14-6:17), hence, the testimony presented at trial doesn't provide a basis to overcome the

presumption that MMG is the owner of the copyrighted bond page.  Accordingly, Plaintiff is

entitled to assert the present copyright  infringement action.

**b.     Unauthorized Copying**

The second prong required to establish a case of copyright infringement requires that a

plaintiff establish "unauthorized copying of original elements of the plaintiff's work."  Dun &

Bradstreet Software Services, Inc. v. Grace Consulting,, 307 F.3d 197, 206 (3d Cir. 2002).  Here,

the record is replete with direct and circumstantial evidence indicating that Defendants copied

MMG's bond page and that this copying resulted in the misappropriation of Plaintiff's

protectable expression.  The direct evidence comes from Freedman's deposition testimony and

the depositions of Greitzer, Byer, Dabke and Chokry.  In his testimony, Freedman concedes that

he and his collaborators had access to the MMG website through a series of fictitious names.  He

states that he viewed competitors' websites to better see how to create his own website which

provided substantially similar services.  Among all of Defendants' competitors, MMG was the

only website that utilized the exact same elements, including:  information and analysis of bond

prices and mortgage interest rates through dynamic candle stick charts and a dynamic bond table

coupled with a two-minute refresher and specific customization options such as trendlines,

resistance and support, moving averages, and stochastics.

Furthermore, Defendants' website developer, Nabh Information Systems, Inc., used

MMG's website as a template to design the Freedman Report.  It was established beyond denial

not only in Freedman's deposition testimony, but also by Exhibits P-33 through P-50, that Nabh,

on behalf of the Freedman Report, appropriated MMG's dynamic bond table and dynamic

candlestick chart, and its selection and arrangement of customization options, including

resistance and support, moving averages, stochastics, and trendlines.  MMG's bond page was copied in such a meticulous manner that even the two-minute refresh rate, and bond pricing comparisons at various hours of the morning (MMG used four time slots; Freedman Report used two time slots) were appropriated.  The Freedman Report also used the same language for its customization feature: "customize your chart with the options below."  Defendants copied this language directly from MMG's website.  Defendants were so bold as to copy MMG's new website features as they were created.  This is evidenced by MMG adding trendlines to its options in July 2005.  Only after looking at MMG's website post July 2005 did Freedman instruct Nabh to add trendlines to the Freedman Report.  (See Tr. Vol. 2, Freedman, April 10, 2007 at 131:8-11).

Even if the Court were to hold that the direct evidence on the record and presented at trial against Defendants was not enough to establish infringement, "copying may be inferred where a plaintiff establishes that the defendant had access to the copyrighted work and that substantial similarities exist as to the protectable material in the two works."  Lipton v. The Nature Co., 71 F.3d 464, 471 (2d Cir. 1995) (quoting Walker v. Time Life Films, Inc., 784 F.3d 44, 48 (2d Cir. 1986), cert. denied, 476 U.S. 1159 (1986)).  Here, it has been shown that Freedman accessed MMG's website beginning in early 2005 through his colleague Michael Glick.  Mozes accessed the MMG website in 2004.  Greitzer accessed the MMG website in 2005 through his subscription, under the alias, Daniel Raymond.  Byer accessed the MMG website, under his own name, in the spring and summer of 2005.  This provides unequivocal evidence establishing Defendants' access to the MMG website.

The second prong requires that a plaintiff establish that the infringing copy is substantially similar to the copyrighted work.  Educ. Testing Servs. v. Katzman, 793 F.2d 533, 540 (3d Cir. 1986).  The Third Circuit defined the substantial similarity test as "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value."  Id. at 541; see National Conference of Bar Examiners v. Multistate Legal Studies, Inc., 458 F. Supp. 2d 252, 258 (E.D. Pa. 2006) ("less than wholesale reproduction can also provide a sufficient basis to conclude that there was copying").  "[I]t is the presence of substantial similarities rather than differences which determines whether infringement exists.  The existence of differences will not negate infringement unless they so outweigh similarities that the similarities can only be deemed inconsequential within the total context of plaintiff's work."  Taylor Corp. v. Four Seasons Greetings LLC, 171 F. Supp. 2d 970, 976 (D. Minn. 2001) (quoting Chuck Blore & Don Richman, Inc. v. 20/20 Adver. Inc, 674 F.Supp. 671, 680 (D. Minn. 1987)).

In the present case, the differences between the competing bond pages are negligible.  Out of all the defining features and customization options found on the MMG bond page, the only significant differences between it and the Freedman Report's bond page are that the Freedman Report uses different Fannie and Ginnie Mae securities in its bond table, includes a 40-day moving average and offers the ability to chart the 10 year Treasury.  (Tr. Vol 11, Freedman, October 25, 2007 at p. 33:7-33:19).  Despite the existence of other minor differences, discussed supra at pp.15-20, there are substantial similarities between the two bond pages, which include: a dynamic bond table, a candlestick chart, and customization options.  Furthermore, the

-63-

customization options are similar in that both contain stochastics, trendlines, moving options, customization options, as well as resistance and support.  Similarly, both websites give the user the ability to view dynamic candlestick charts only.  The Court relies on these substantial similarities, as opposed to the minor differences between the two bond pages, to guide its decision.  Accordingly, the Court finds that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the Plaintiff's protectable expression by taking material of substance and value in violation of Plaintiff's copyright.

Defendants rely on the principle of merger between an idea and expression to support their contention that MMG's selection and arrangement of financial analysis tools are precluded from copyright protection because they contend that the idea can only be expressed in a limited number of ways.  See Educ. Testing Services v. Katzman, 793 F.2d 533, 539 (3rd Cir. 1986); see also, Sid & Marty Krofft Television Products, Inc. v. McDonalds Corp., 562 F.2d 1157, 1167-68 (9th Cir. 1977); Morrissey v. Procter & Gamble Co., 379 F.2d 675 (1st Cir. 1967).  When an idea and the expression of the idea coincide, then the expression will not be protected because such would grant protection to the idea itself, in violation of § 102.  See M.B. Nimmer, Nimmer on Copyright § 2.03[D], and § 13.03[B][3] (2007). The idea itself is not subject to copyright protection; only those elements of the copyrighted work which express the idea and are themselves the subject of copyright may be considered.  See Atari, Inc. v. North American Philips Consumer Electronics Corp., 672 F.2d 607, 614 (7th Cir. 1982), cert. denied, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982).

As to determining the line between an idea and expression, a guiding consideration is the preservation of the balance between competition and the protection reflected in the copyright

-64-

law.  Herbert Rosenthal Jewelry Corp. v. Kalpakian, 446 F.2d 738 (9th Cir. 1971).  In other

words, one must consider from how large an area of activity did Congress intend to enable the

copyright owner to exclude others.  Id.  (finding that the production of jeweled bee pins is a

larger area than Congress intended to set apart from the public market).  As stated by the court in

Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1444 (9th Cir. 1994) cert denied, 513

U.S. 1184, 115 S.Ct. 1176, 130 L.Ed.2d 1129 (1995):

> First, when an idea and its expression are indistinguishable, or "merged,"
> the expression will only be protected against nearly identical copying.  Krofft, 562
> F.2d at 1167-68; Kalpakian, 446 F.2d at 742.  For example, in this case, the idea
> of an icon in a desktop metaphor representing a document stored in a computer
> program can only be expressed in so many ways.  An iconic image shaped like a
> page is an obvious choice.
>
> The doctrine of scenes a faire is closely related. As we explained in
> Frybarger v. International Business Machines Corp., 812 F.2d 525 (9th Cir.1987),
> when similar features in a videogame are " 'as a practical matter indispensable, or
> at least standard, in the treatment of a given [idea],' " they are treated like ideas
> and are therefore not protected by copyright.  Id. at 530 (quoting Atari, Inc. v.
> North Am. Philips Consumer Elecs. Corp., 672 F.2d 607, 616 (7th Cir.), cert.
> denied, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982)).

See also, Johnson Controls, Inc. v. Phoenix Controls Systems, Inc., 886 F.2d 1173, 1175 (9th

Cir. 1989).  Thus copyright is available only to protect the form of a work, separate from its

function, and if such a separation is not possible, copyright protection is unavailable.  Schnadig

Corp. v. Gaines Mfg. Co. Inc., 620 F.2d 1166, 1167 (6th Cir. 1980); see Herbert Rosenthal

Jewelry Corp. v. Kalpakian, 446 F2d 738 (9th Cir. 1971) (the idea of jewelry pin in the form of a

jewel encrusted bee was capable of expression in only one form and there was no protection

found).

Here, the various features of the bond page, i.e., the featured securities, current pricing, changes from benchmark times, Japanese candlestick charts, stochastics, trend lines, moving averages, support and resistance, charting time periods, printing ability and options all serve particular functions.  In some instances the form that they take cannot be separated from their function.  For example, Japanese candlesticks must be constructed according to certain rules, and by following those rules they will take on a similar form.  The same is true with respect to some of the other aspects of the parties' bond pages.  Defendants contend that to the extent that the form can be separated from the function, they have done so (e.g., black candle wicks, black outline around candles, different chart scales, fewer benchmark times, etc.).  However, the Court disagrees.  In this case, it is the particular selection and arrangement of a particular subset of unique financial analysis tools which were not previously applied to the mortgage market that together make up a copyrightable work.  The unique customization options that MMG provides in its bond page combined with its selection and arrangement of such options is protectable under the copyright laws.  The number of ways to express each particular financial analysis tool may be limited, but their selection and arrangement into a unique and customizable way to provide financial analysis of the mortgage market is a unique expression.[7]  Therefore, the Court rejects Defendants' argument that the idea of providing financial analysis of the mortgage market

---

[7]To the extent that Plaintiff argues that the use of Japanese candlestick charts, stochastics, or bond tables are entitled to copyright protection, individually, in their application to mortgage securities and the Mortgage Industry, the Court rejects it.  For example, the simple use of Japanese candlestick charts in application to the Mortgage Industry or mortgage securities on a web page is not protectable by copyright, and the Court declines to single out any one item in the MMG bond page as it is the selection and arrangement of all the items present in MMG's bond page that makes for a unique copyrightable expression.

merges with the unique expression of providing such analysis through specific types of tables,

charts, and customization tools.

### iv.    LIABILITY OF INDIVIDUAL DEFENDANTS

"It is well settled that 'one who, with knowledge of the infringing activity, induces,

causes, or materially contributes to the infringing activity of another, may be held liable as a

"contributory" [copyright] infringer.' " Columbia Pictures Industries, Inc. v. Redd Horne, Inc.,

749 F.2d 154, 160 (3d Cir.1984).  "Further, an individual may be held vicariously liable for

copyright infringement if he or she 'ha[d] the right and ability to supervise the infringing activity

and also ha[d] a direct financial interest in such activities.' Microsoft Corp. v. Sellers, 411 F.

Supp. 2d 913, 920 (E.D. Tenn. 2006); (quoting Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d

259, 262 (9th Cir.1996).  "An individual can be held vicariously liable even if he was ignorant of

the infringement." Superhype Publishing, Inc. v. Vasiliou, 838 F. Supp. 1220, 1225 (S.D. Ohio

1993).  "Corporate officers have been held liable for the copyright infringement committed by

their corporate entity in a variety of situations." Blendingwell Music, Inc. v. Moor-Law, Inc.,

612 F. Supp. 474, 482 (D. Del. 1985); see Lottie Joplin Thomas Trust v. Crown Publishers, Inc.,

456 F. Supp. 531, 537 (S.D.N.Y.1977) (holding officer that negotiated with parties to produce

infringing records, oversaw all operations, and had a substantial financial stake in success of

infringing venture liable for contributory infringement), aff'd., 592 F.2d 651 (2d Cir.1978); Boz

Scaggs Music v. KND Corp., 491 F. Supp. 908, 913 (D. Conn.1980) (holding corporate

vice-president, who was also general manager of radio station, liable for infringing conduct of

radio station in view of his responsibility to oversee operations, his direct financial interest in the

station, and his failure to take any precautions or to police against infringement); Warner Bros.,

Inc. v. O'Keefe, 468 F. Supp. 16, 19 (S.D.Iowa 1977) (holding sole stockholder, officer and employee of corporation, that operated a bar featuring live and jukebox performances of copyrighted material that were unauthorized, personally liable for copyright infringement).

In applying the concept of individual liability, the Second Circuit in Softel held that when the "only evidence presented prior to the court's ruling relating to the issue of [the president of the infringing company's] supervisory capacities and financial interests was that [he] was the president of [the infringing company] and a shareholder," no individual liability existed. Softel, Inc. v. Dragon Medical and Scientific Communications, Inc., 118 F.3d 955, 971 (2nd Cir. 1997), cert. den. 523 U.S. 1020 (1998). Therefore, evidence showing that an individual is merely an officer and shareholder of the company is not sufficient. Id.

However, in this case, there is extensive testimony showing that Freedman and Mozes played an integral role in the supervisory decision to build an identical bond web page to that created by MMG. Mozes first viewed the MMG Website sometime before August 27, 2004. (Mozes Dep. 49:20-25). Subsequently, Mozes tracked the development of the MMG website "to see what elements they had added over time." (Mozes Dep. 73:12-20). The night before interviewing Greitzer, the Freedman Report's Director of Marketing, Mozes, suggested that he look at MMG's Website to understand what the Freedman Report wanted to do. (Greitzer Dep. 14:4-18; Mozes Dep. 30:21-31:13). Mozes did not discuss any other competing websites with Greitzer during his interview. (Mozes Dep. 31:22-32:1). When Greitzer was hired, his primary responsibility was to manage setting up the Freedman Report's website. (Greitzer Dep. p.28:20-29:9).

Freedman also held a supervisory role in the decision to copy MMG's bond page. Greitzer was the principal person dealing with Byer at Dice Media, which was the website development company the Freedman Report hired to design its website.  (Greitzer Dep. 28:20-29:17).  However, Freedman gave Byer a link to the MMG Website and Byer subscribed to the MMG Website under his own name.  (Byer, 33:22-36:15).  He logged in 13 times between May 25 and June 9, 2005.  (Tr. Vol. 7, Warner, October 11, 2007 at p. 67:25-68:11).  These facts, along with the Nabh proposals using portions of MMG's website make it clear to the Court that Freedman and Mozes played a critical supervisory role in the copying of the MMG bond page.

In addition, evidence in the record shows that Freedman and Mozes each own 50% of the Freedman Report, which the Court views as a significant financial interest in the underlying company that is infringing Plaintiff's copyright.  (Tr. Vol. 2, Freedman, April 10, 2007 at p. 46:11-46:17).  The facts of this case are much more developed than those that were present in Softel, and here, the Court finds that it is enough to confer individual liability on Freedman and Mozes.  In comparison, there can be no individual liability for Greitzer because he was merely an employee of the Freedman Report and did not have a significant financial stake in the underlying company.

### B.   CONTRACT CLAIM

#### i.   Preemption

As an initial matter, the Court must decide the seminal issue of whether Plaintiff's breach of contract claim is pre-empted by the Copyright Act (the "Act").  The Act itself provides guidance on this particular subject by stating in relevant part:

> all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a).  Among the rights specified in Section 106 are the right "(1) to reproduce the copyrighted work in copies . . . (2) to prepare derivative works based upon the copyrighted work; [and] (3) to distribute copies . . .  of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."  17 U.S.C. § 106.  To determine "whether a state claim is preempted requires a two-part analysis. First, the court must ascertain whether the subject matter requirement is met; that is, whether the work at issue is of the type that generally falls within the protection of the Copyright Act.  Second, the court must decide if the state law creates rights equivalent to those protected by federal copyright law.  This is known as the general scope requirement." Torah Soft, Ltd. v. Drosnin, 224 F. Supp. 2d 704, 716 (S.D.N.Y. 2002); Video Pipeline, Inc.v. Buena Vista Home Entertainment, Inc., 210 F. Supp. 2d 552, 563-54 (D.N.J. 2002); see Lennon v. Seaman, 63 F. Supp. 2d 428, 435 (S.D.N.Y. 1999); Brignoli v. Balch Hardy and Scheinman, Inc., 645 F. Supp. 1201, 1204-05 (S.D.N.Y. 1986); Recursion Software, Inc. v. Interactive Intelligence, Inc., 425 F. Supp. 2d 756, 766-767 (N.D. Tex. 2006).

The Court notes that the question of whether breach of contract actions are preempted by § 301 of the Copyright Act is unsettled.  Indeed, most courts to examine this issue have found that the Copyright Act does not preempt contractual constraints on copyrighted articles.  See, e.g., ProCD, Inc. v. Zeidenberg, 86 F.3d 1447 (7th Cir.1996) (holding that a shrink-wrap license was not preempted by federal copyright law, reasoning that: "A copyright is a right against the

world. Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create 'exclusive rights.'" ); <u>Lipscher v. LRP Publ'ns, Inc.</u>, 266 F.3d 1305, 1318-19 (11th Cir.2001) (concluding that the breach of contract claim was not preempted because "[t]he rights sought to be enforced in [the] breach of contract claim are not equivalent to the exclusive rights of § 106 . . . ."); <u>Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.</u>, 991 F.2d 426, 431-32 (8th Cir.), cert. denied, 510 U.S. 861, 114 S.Ct. 176, 126 L.Ed.2d 136 (1993) (concluding that "the contractual restriction on use of the programs constitutes an additional element making this cause of action not equivalent to a copyright action"); <u>Taquino v. Teledyne Monarch Rubber</u>, 893 F.2d 1488, 1501 (5th Cir.1990) (concluding that "[t]his action for breach of contract involves an element in addition to mere reproduction, distribution or display: the contract promise made by Taquino, therefore, it is not preempted".); <u>cf. Acorn Structures, Inc. v. Swantz</u>, 846 F.2d  923, 926 (4th Cir.1988) (reversing finding of preemption because breach of contract claim was not within subject matter of copyright but arose out of implicit contractual provisions of the agreement).  However, this case is distinguishable because here, there is no extra element beyond that afforded by the Copyright Act.

The first prong of the preemption test, requiring that the work generally falls within the same subject matter protected by the Copyright Act, <u>Video Pipeline, Inc.</u>, 210 F. Supp. at 563-54, is satisfied because here there is a valid copyright registration for the MMG Website.  The MMG Website contains the MMG bond page, which is the subject matter in dispute in this case and is subject to copyright protection.  Therefore, the first prong required to show pre-emption is met.

The second part of the test requires the Court to decide if state law creates rights equivalent to those protected by federal copyright law.  <u>Video Pipeline, Inc.</u>, 210 F. Supp. at 563-54.  Here, the MMG website's Subscriber Terms and Conditions states in pertinent part:

> While using this Service, you may not:
>
> . . . .
>
> 4. Upload, post, publish, transmit, reproduce, distribute or in any way exploit any information, software or other material obtained through the Service for commercial purposes (other than as expressly permitted by the provider of such information, software or other material).

(<u>See</u> P-120).  These are the same rights protected in Section 106 of the Copyright Act, namely: reproduction and distribution.  A right under state law is deemed to be equivalent to copyright if it "is one that is infringed by the mere act of reproduction, performance, distribution, or display.  The fact that the state-created right is either broader or narrower than its federal counterpart will not save it from pre-emption."  1 Nimmer on Copyright, § 1.01[B][1] at p.1-12.  However,

> [t]he essence of an enforceable contract . . . is consideration.  Without a promise there is no contract.  Whereas conversely a promise on the part of one who engages in unlicensed reproduction is not a prerequisite to his being a copyright infringer.  Consequently, pre-emption should [not apply] to the extent that a breach of contract cause of action alleges more than simply reproduction (or adaptation, distribution, etc.) of a copyrighted work.

<u>Id.</u>  Hence, "the federal Copyright Act does not preempt a claim where [a]n extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action . . . A state law claim is not preempted if the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement [c]laim."  <u>Video Pipeline, Inc.v. Buena Vista Home Entertainment, Inc.</u>, 210 F.

Supp. 2d 552, 566 (2002) (quoting Expediters Int'l of Washington, Inc. v. Direct Line Cargo

Mgmt. Svcs., Inc., 995 F. Supp. 468, 479-80 (D.N.J.1998)).

In Video Pipeline, Inc., the district court relied on a case from the Sixth Circuit which

held that: "If the promise amounts only to a promise to refrain from reproducing, performing,

distributing or displaying the work, then the contract claim is preempted." Wrench LLC v. Taco

Bell Corp., 256 F.3d 446, 457 (6th Cir.2001), cert. denied, 534 U.S. 1114 (2002).  In applying

that rule to its case, the court in Video Pipeline, Inc. reasoned that because the defendant's beach

of contract claim asserts that the plaintiff breached a contractual obligation to return Promotional

Previews to the defendant, that it constituted an additional element to that protected by the

Copyright Act, and as a consequence was not preempted.  Video Pipeline, Inc., 210 F. Supp. 2d

at 567.

Similarly, in Ballas v. Tedesco, 41 F. Supp.2d 531, 536 (D.N.J.1999), the district court

dealt with the contract preemption issue in a footnote, concluding that National Car Rental,

Taquino, Acorn and ProCD "do not stand for the proposition that no breach of contract action

would ever be barred by § 301."  41 F. Supp.2d at 536 n. 14.  There the court quoted from

National Car Rental which stated that "'[b]ecause we decide that the specific contract right

[defendant] seeks to enforce is not equivalent to any of the copyright rights, we do not need to

decide whether a breach of contract claim based on a wrongful exercise of one of the exclusive

copyright rights is preempted.'" Id. (quoting 991 F.2d at 434 n. 6).  In Ballas, the court intimated

that to escape preemption the specific contract right that a party seeks to enforce must be

different or contain an additional element to those inherent to a copyright infringement claim.

Here, Defendants do not seek to enforce specific contract rights outside the scope of the

-73-

copyright laws.  While the MMG Subscriber Terms and Conditions contain various provisions concerning user conduct and even indemnification of attorneys' fees in the event of litigation, the main thrust of Plaintiff's breach of contract claim focuses on the reproduction, distribution or exploitation of information from the MMG Website. (See Amend. Compl. at pp. 24-27).  Unlike the contract claim in Video Pipeline, Inc., which contained an additional obligation (to return promotional materials), above those provided by copyright law, here, Plaintiff's breach of contract claim must be preempted because it doesn't seek to enforce anything more than what the Copyright Act was intended to protect against.  And even though Plaintiff seeks to enforce an attorneys' fees provision in the MMG Subscriber Terms and Conditions, attorneys' fees are also covered by the Copyright Act.  Thus, in accord with the reasoning in Video Pipeline, Inc. and Ballas, this court holds that Plaintiff's breach of contract claim is preempted by the Copyright Act.

### C.     COPYRIGHT INFRINGEMENT DAMAGES

#### 1.     Statutory Damages under the Copyright Act

Section 412 of the Copyright Act sets forth certain remedies for infringement and provides in relevant part:

> no award of statutory damages or of attorney's fees  . . . shall be made for –
>
> (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration, or
>
> (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after first publication of the work.

17 U.S.C. § 412; see Qualey v. Caring Center of Slidell, 942 F. Supp. 1074, (E.D.La. 1996)

(where the copyrighted work was allegedly published on March 25, 1994, registration was

effective June 17, 1994 and the asserted infringement commenced in October 1993, the court

held that infringement could only have been of an unpublished work at that time, and since there

was no registration at the time of the infringement statutory damages and attorney's fees were

precluded by § 412.)

Defendants contend they began publishing their own website in and after July 2005, and

that if such conduct was infringing, it occurred before the publication of Plaintiff's bond page

and therefore could only have been infringing an unpublished work.  Defendants base this

proposition on the assertion that November 29, 2005 is the publication date of the MMG bond

page; however, as discussed supra, pp. 25-26, the Court finds that the MMG bond page has a first

publication date of July 27, 2005.  Nonetheless, Sections 412(1)-(2) still operate to bar statutory

damages and attorneys' fees.

Defendants' infringement commenced before July 27, 2005, the publication date of the

bond page, thereby warranting application of 412(1) to determine if statutory damages and

attorneys' fees are available.  Here, the infringed work is the MMG bond page published on July

27, 2005.  Plaintiff alleges that Defendants copied its bond page between July 2005 and

November 2005.  P-32, an email dated July 14, 2005, from Dabke to Byer states that he looked at

the MMG Website to see what was involved.  P-33 is a Nabh Statement of Work, prepared for

the Freedman Report, which is also dated July 14, 2005.  This Statement of Work contains

portions which appear to be taken directly from the MMG Website, including its bond page.

Although, it wasn't until August 23, 2005 that a "Bond Quotes Application: Project Quote" from

Nabh reflected the actual features embodied in the MMG bond page, the record demonstrates that the Freedman Report was copying portions of the MMG bond page in an effort to design its own website starting in the middle of July, two weeks before the publication date of MMG's bond page with trendlines.  The Freedman Report's infringing bond page was not published on the web until October 2005, however it is apparent, as demonstrated by the record, that the Freedman Report, through its employees, was infringing upon Plaintiff's copyright before the July 27, 2005 date of first publication.  Because the effective date of the first registration (December 7, 2005) and the last supplemental registration (January 18, 2007) occurred subsequent to the date of first publication (July 27, 2005) Plaintiff is not entitled to statutory damages or attorneys' fees.

However, even if the Court were to find that the infringement commenced after the date of first publication, statutory damages and attorneys' fees would still be barred.  In this regard, Section 412(2) bars damages and attorneys' fees because the effective date of MMG's copyright registration was not made within three months of the July 27, 2005 publication date.  The effective date of the first registration was December 7, 2005, more than three months later.  The effective date of the latest supplemental registration is January 18, 2007, nearly one and a half years later.  Thus, MMG cannot be awarded attorneys' fees or statutory damages based on either Section 412(1) or 412(2).

## 2.    Measure of Lost Damages

Even if Plaintiff were eligible to collect statutory damages under the Copyright Act, the Court finds that the evidence presented regarding lost revenues and value is speculative and does not warrant an award of damages.  The Third Circuit held that the "modern trend favors the admission of [lay] opinion testimony, provided that it is well founded on personal knowledge and

susceptible to specific cross-examination."   Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153,

1175 (3d Cir. 1993) (quoting Teen-Ed, Inc. V. Kimball Intl., Inc., 620 F.2d 399, 403 (3d Cir.

1980).  Plaintiff proffered proof of its damages with the testimony of its owners, Habib and

Warner, and the submission of various lists and charts which tallied the alleged losses that were

suffered as a result of Defendants' copyright infringement.  To calculate damages, MMG

prepared a list of names on the Freedman Report's membership lists (trial or paying) that matched

the names that had appeared on lists of MMG's former paying or trial members.  (Tr. Vol. 5,

Habib, October 9, 2007 at 4:20-5:19; 12:24-13:9; Tr. Vol. 8, Peskin, October 22, 2007 at

4:6-10:10).  MMG then assumed that a percentage of its trial subscribers that appeared on the list

would have become paid subscribers with MMG if the Freedman Report did not exist.  (Tr. Vol.

5, Habib, October 9, 2007 at 13:10-14:6).

        The prepared lists are problematic in many respects.  Firstly, although MMG included all

its former paid members who appear on the list of common names provided to support its

damage claim, it conceded that once a MMG paid subscriber becomes "inactive," no more than

15% ever return to MMG.  (Tr. Vol. 6, Habib, October 10, 2007 at 139:10139:25).  Secondly,

MMG did not consider duplicates in the email addresses of the persons, the street addresses, the

dates of any subscriptions, or whether or not those names also appeared on the list of active

MMG subscribers.  (Tr. Vol. 8, Peskin, October 22, 2007 at 12:4-13:20).  The list of names of

persons for which MMG is claiming damages (P-126) includes names with different spellings

(e.g., Eric Johnson and Erik Johnson, Jim Hayes and James Hayes, Jamey Hodge and Jamie

Hodge, Michael Martin and Mike Martin), different email addresses (e.g., Eric Johnson, John

Doe), names that did not appear on MMG's list of inactive subscribers (e.g, Cheryl Whitworth),

and names of persons that resided in different states (e.g., Alex Guzman, Jim Hayes, Dave

Beckman, Denise Wargo, Jamey Hodge, Jodi White, Louis Javell, Michael Martin).  (Tr. Vol. 8,

Peskin, October 22, 2007 at 14:1-35:3).  Little consideration was given to the date on which a

person terminated his or her subscription to MMG.  (Tr. Vol. 8, Peskin, October 22, 2007 at

33:20-33:24).  The trial testimony was not exhaustive, and other deficiencies appear from the

underlying documents:  such as the inclusion of persons who are active subscribers to MMG

(e.g., Jonathan Carter listed on D-70 at p. 5772), additional persons residing in different states

(e.g, Greg Becker, compare P-118 at p. FR944 with D-71 at p. 8007), and other persons whose

names do not appear on MMG's inactive subscriber lists (e.g., Tom Cunningham, Jeannette

Evans, Harry Venik).

      MMG purported to remove from the damages list the names of persons who either

obtained a subscription to the Freedman Report before they subscribed to MMG, or who

resubscribed to MMG after trying Freedman.  (Tr. Vol. 8, Warner, October 22, 2007 at

46:14-47:19; 113:6-113:16 P-133;).  However, the revised list (P-133) still is inaccurate (e.g.,

Diane Campbell as shown on P-129 at p. FR947 and D-72 at p. 8024; Jesse Fernandez as shown

by D-31 at 5th from the bottom on p. 33a and 33f and D-71 at p. 7865; Victor Jiminez as shown

by P-129 at p. FR905 and D-72 at p. 8104; etc).  MMG's damages list also includes the names of

persons who terminated their subscription to MMG before Freedman's website even existed (e.g.,

James Wright, Robert Veldkamp, Elizabeth Camacho, and many others identified at trial),

persons who took a subscription to MMG after having only taken a trial subscription at Freedman

(e.g., James Wright and Tammi Koza), persons who may have only been trial subscribers at both

websites and/or never took out a paid subscription at the Freedman Report's site (e.g., Kelby

Smith, Kevin Maher, Edwina Camarillo, Pamela McDaniel, etc), persons who took out paid subscriptions to MMG after having tried the Freedman Report (e.g., Anna Marie Kitras, Jesse Fernandez, Jonathan Carter), Freedman's California attorney (Michael DiNardo, Esq.), persons who did not appear on any list of former MMG subscribers (e.g., Jonathan Carter, Jeannette Evans, Harry Venik), persons who discontinued their subscription at MMG before Freedman had the allegedly infringing bond page (e.g., Lillian Kossakoff), and persons who took out either a paying or trial subscription to the Freedman Report a year or more after they had terminated their MMG subscription (e.g., Carl Henker, Jill Korenaga, Kevin Elmore, Lori Saucier).  (Tr. Vol. 8, Warner, October 22, 2007 at 63:3-100:19; 138:5-143:5).

By including revenue based upon expected subscription renewals in the damages claim, (Tr. Vol. 5, Habib, October 9, 2007 at 16:7-23:13), MMG ignores the possibility that these individuals may have already decided not to renew with MMG for any of a host of reasons, and in some instances even before the Freedman Report existed.  Although MMG's alleged profit was 56% of revenue, (Tr. Vol. 5, Habib, October 9, 2007 at 24:1-24:7), it used a profit factor of 80% to calculate its lost damage claim, (Tr. Vol. 5, Habib, October 9, 2007 at 23:25-24:6).  These reasons highlight the highly speculative nature of Plaintiff's lost revenues damages claim.

Finally, in its damages calculation, Plaintiff not only includes a claim for recovery of lost revenues, but it also includes an additional claim for a recovery of lost value when the company was later sold to a third party.  (Tr. Vol. 5, Habib, October 9, 2007 at 23:11-24:9).  The Court finds that a lost value claim was properly brought in this case because any damages suffered as a consequence of Defendants' copyright infringement would be borne by Plaintiff MMG, not the individuals who own shares in the company, even if the individual owners of MMG would

-79-

receive the benefit of lost value damages awarded in this particular circumstance.  (Tr. Vol. 8,

Warner, October 22, 2007 at 53:2-53:19).  Nonetheless, if the Court allows such a claim to stand

scrutiny, it would constitute a double recovery because Plaintiff's lost value damages are

predicated on lost revenues damages, which have already been taken into consideration and

determined by the Court to be speculative.  Thus, the Court declines to award lost value damages.

### D.  INJUNCTIVE RELIEF

Section 502(a) of the Copyright Act authorizes injunctive relief to prevent or restrain

copyright infringement.  17 U.S.C. § 502(a).  Recently, the United States Supreme Court

addressed the use of injunctions in patent and copyright infringement cases. See eBay, Inc. v.

Mercexchange, L.L.C., 547 U.S. 388 (2006).  The Supreme Court held that the issuance of an

injunction was discretionary and that a party seeking injunctive relief must satisfy a four-factor

test: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as

monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance

of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

public interest would not be disserved by a permanent injunction."  Id. at 391.  In eBay, the

Supreme Court reversed the Court of Appeals, rejecting a rule that "an injunction automatically

follows a determination that a copyright has been infringed."  Id. at 391 (citing New York Times

Co. v. Tasino, 533 U.S. 483, 505 (2001)).  The eBay case rejected categorical rules and broad

classifications for issuing permanent injunctions and brought the focus back to traditional

considerations of equity which are determined by the unique set of circumstances in each case.

Id. at 393-394.

-80-

Nonetheless, in his concurring opinion, the Chief Justice opined that the exercise of equitable discretion in infringement cases must be informed by the historical use of injunctions and that, "When it comes to discerning and applying those standards, in this area as others, 'a page of history is worth a volume of logic.'" Id. at 394-95 (quoting New York Trust Co. v. Eisner, 256 U.S. 345, 349 (1921) (opinion for the Court by Holmes, J.)).  This is particularly relevant when considering the "difficulty of protecting a right to exclude through monetary remedies that allow an infringer to use an invention against the patentee's wishes."  Id. at 395.

The first factor that the Court will address is "irreparable injury."  eBay, Inc., 547 U.S. at 391.  In the present case, irreparable harm will occur if a permanent injunction does not issue because MMG's valid copyright in its bond page will be eviscerated by the Freedman Report's continued use of its copyrighted work.  Section 106 of the Copyright Act grants the copyright holder an "exclusive right" to reproduce the copyrighted works and to prepare derivative works based on the copyrighted work.  17 U.S.C. §106(1) - (2).  MMG distributed a daily website to its subscribers and its live bond page is the core of the service provided to its subscribers, the service being to enable them to anticipate changes in mortgage interest rates based on current movement in the prices of certain securities.  In this case, the only way to prevent irreparable injury to MMG's copyright is to issue a permanent injunction preventing future acts of infringement.

The second factor that the Court will address is "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury."  eBay, Inc., 547 U.S. at 391.  In the present case, monetary compensation alone is not an appropriate remedy.  Firstly, because the damages claimed in this case are too speculative to award.  Secondly, because the Freedman

Report has appropriated MMG's protected expression and is using it to compete with MMG on a daily basis for subscribers.  As evidenced by the damages section of this Opinion, it is difficult to prove that a person subscribed to the Freedman Report rather than the MMG Website as a proximate consequence of the Defendants' infringement rather than some other factor such as price or elements other than the live bond page.  A forward-looking monetary remedy would also present significant hurdles to enforcement as it would require the monitoring and auditing of new Freedman's subscriptions, which may collaterally impact subscribers' privacy rights.  Thus, monetary remedies do not present a viable solution in this case.

The third factor the Court must consider is whether "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted."  eBay, Inc., 547 U.S. at 391.  Regarding the balancing of hardships, an injunction will vindicate MMG's exclusive rights under the Copyright Act, and will merely require Defendants to modify the Freedman Report's bond page.  Thereafter, the Freedman Report can continue to compete against MMG, except not with the protected arrangement and selection of tools and customization options that were created by MMG.  This will not provide an undue burden upon the Freedman Report.

Finally, the last factor is whether "the public interest would not be disserved by a permanent injunction."  eBay, Inc., 547 U.S. at 391.  In this case Defendants argue that the public interest would be disserved in that an injunction would have the effect of conferring on MMG a monopoly in a segment of the financial analysis industry with respect to the use of common, well known, and widely used financial analysis tools.  The Court disagrees because the Freedman Report and MMG's other competitors will continue to be able to compete against each other and MMG using similar financial analysis tools, however, just not in the same combination,

arrangement and presentation as that which was copyrighted by MMG.  Therefore, after

analyzing the four factors, the Court finds that a permanent injunction is appropriate in this case.

Furthermore, the Third Circuit has recognized protection of a copyright holder's

competitive position as a basis for issuance of a preliminary injunction.  Apple Computer, Inc. v.

Franklin Computing Corporation, 714 F.2d 1240 (3rd Cir. 1983).  There, Franklin had copied

Apple's computer programs and was producing its own brand of computers based on Apple's

operating system; it was competing with Apple.  The Third Circuit reversed the district court's

denial of a preliminary injunction, holding that "even without the presumption of irreparable

harm . . . the jeopardy to Apple's investment and competitive position caused by Franklin's

wholesale copying of many of its key operating programs would satisfy the requirement of

irreparable harm needed to support a preliminary injunction."  Apple Computer, Inc., 714 F.2d at

1254.  The court also observed that a knowing infringer cannot be "permitted to construct its

business around its infringement."  Id. at 1255.

Defendants built the Freedman Report around their infringement of MMG's copyright.

Instead of exercising their own creativity, they pointed Dabke to MMG's bond page and told him

to build it.  He did, and Defendants began to compete with MMG using a substantially similar

version of MMG's bond page.  Thus, the Court enjoins Defendants from using Plaintiff's same

selection and arrangement as embodied in the MMG's bond page.  The Court does not find that

any of the individual financial analysis tools used in MMG's bond page are protected by its

copyright, however the Court finds that it is the specific selection and arrangement of these

financial analysis tools along with unique customization options into a web page that is

protected. The selection and arrangement of a dynamic bond table with prices measured from

various times during the day or from a last sale price and the display of price changes as they

occur through a dynamic candlestick chart with various customization options (i.e. - the

combination of trendlines, moving averages, resistance and support and stochastics) is what is

covered by Plaintiff's copyright.  It is not enough, as Defendants contend, to merely move the

options customization box, or change the charts from vertical to horizontal bars.  Therefore,

despite Defendants' changes, it is still considered by the Court to be infringement upon

Plaintiff's copyright.  The Court stops short of crafting Defendants' website for them, but more

than a mere token effort must be undertaken to comply with the injunction imposed in this

Opinion.

## IV.     CONCLUSION

The Court finds that none of the Defendants are liable for breach of contract of the MMG

Subscriber Terms and Conditions because of preemption.  The Court also finds that the

Freedman Report, Freedman, and Mozes are liable for copyright infringement.  The Freedman

Report reproduced MMG's copyrighted materials and Freedman and Mozes are both individually

liable for copyright infringement because of their supervisory role in the infringement as well as

their significant financial stake in the infringing company, the Freedman Report.  Therefore the

Court finds that it is proper to enter an injunction against the aforementioned Defendants

prohibiting them from  infringing upon Plaintiff's bond page.  With respect to damages, the

Court awards nothing because it finds the evidence proffered by Plaintiff to be too speculative.

Dated: July 28, 2008

s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge